IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA


UNITED STATES OF AMERICA,

        Plaintiff,

vs.

SHOLOM RUBASHKIN,

        Defendant.

No. 08-mj-381

**ORDER FOR DETENTION**

———————————

    On the 19th day of November 2008, this matter came on for hearing on the Government's application to have the Defendant detained prior to trial. The Government was represented by Assistant United States Attorneys Peter E. Deegan, Jr. and Matthew Cole. Defendant Sholom Rubashkin appeared personally and was represented by his attorneys, F. Montgomery Brown and Baruch Weiss.

## *RELEVANT FACTS*

    By agreement of the parties, the evidence was introduced by proffer and exhibits. Briefly stated, the facts pertaining to detention are these:

    On May 12, 2008, agents of the United States Department of Homeland Security, Immigration and Customs Enforcement ("ICE") executed a search warrant at Agriprocessors, Inc. in Postville, Iowa. Agriprocessors operates a Kosher meat packing and food-processing facility. During the search, ICE agents encountered approximately 389 undocumented aliens who were working at the plant. Agents also found and seized approximately 96 fraudulent permanent resident alien cards from offices within the Human Resources Department at Agriprocessors, most of which were attached to application paperwork dated May 11 or May 12, 2008. Approximately 90 of the fraudulent cards had been assigned to other actual persons. Approximately 11 of the fraudulent resident alien

1

cards exhibited photographs of persons who were working at Agriprocessors prior to May 11, 2008 under names different from those shown on the cards.

When the search was conducted on May 12, Defendant Sholom Rubashkin was Vice-President and CEO of Agriprocessors.[1] Approximately two weeks prior to the search, certain employees at Agriprocessors were told that they would be terminated "because their names did not match their social security numbers." One of the foremen told the employees, however, that new identification documents could be purchased for $220. Many of the employees did not have the money to pay for the documents. Later that evening, two of the supervisors met with Defendant and told him that $4,500 was needed in cash "to help the employees who were to be terminated." The next day, Defendant agreed to loan the employees the money and later that day, $4,500 was provided in $100 bills. On May 9, a portion of the money was delivered to the employees, who then paid the money to the foreman who arranged for the purchase of the fraudulent documents. Also on May 9, Defendant asked an assistant in the Human Resources Department to come in and process new employee applications on Sunday, May 11.[2] The foreman returned to Agriprocessors with the new identification documents on May 11, the day prior to the search. On Sunday afternoon and evening, May 11, a large number of new applications were processed in the human resources area at Agriprocessors. Supervisory persons and Defendant were present. Defendant inspected the first group of permanent resident alien cards and said they "looked good" to him.

Based in part on the information set forth above, the Government filed a criminal complaint on October 30, 2008, charging Defendant with conspiracy to harbor one or more

---

[1] According to published reports, Defendant was subsequently removed as CEO and replaced by Bernard S. Feldman, who previously served as corporate counsel to Agriprocessors.

[2] The human resources assistant noted that new hiring usually happened on Tuesdays and it was very unusual to be processing new applications on Sunday.

aliens, aiding and abetting the possession and use of fraudulent identification documents, and aiding and abetting aggravated identity theft.[3] A warrant was issued for Defendant's arrest. Defendant was arrested and brought before the Court on the same day. By agreement of the parties, Defendant was released under certain conditions, including G.P.S. electronic monitoring, surrender of his passport and that of his wife, and a $1 million bond, with $500,000 of that amount secured by a surety acceptable to the Government.

Also on October 30, 2008, First Bank Business Capital, Inc. ("First Bank") filed a complaint against Agriprocessors, Inc., Local Pride, LLC, Abraham Aaron Rubashkin, and Defendant.[4] First Bank provided credit to Agriprocessors and Local Pride pursuant to a $35 million revolving note. Pursuant to the Credit Agreement, First Bank has a first-priority security interest in various assets, including accounts receivable. The Credit Agreement uses a borrowing-base formula to determine the maximum credit available on the revolving loan. The credit limit is a function of the value of collateral assets, including accounts receivable.

Pursuant to the Credit Agreement and related agreements, Agriprocessors was required to deposit the daily receipts of their accounts receivable in a designated account at Decorah Bank & Trust Company ("Decorah Bank"). The funds in the Decorah Bank account were then transferred (or "swept") to First Bank on a daily basis, thereby paying down Agriprocessors' revolving loan balance. Agriprocessors would then seek additional funds from First Bank.

On November 4, 2008, ICE agents executed a search warrant at Agriprocessors in Postville. During the search, agents seized approximately 77 written requests for advancement of funds submitted by Agriprocessors to First Bank, between July 1, 2008

---

[3] *United States of America v. Sholom Rubashkin*, Case Number 1:08-mj-00363-JSS.

[4] *First Bank Business Capital, Inc. v. Agriprocessors, Inc., Local Pride, L.L.C., Abraham Aaron Rubashkin, and Sholom Rubashkin*, Case Number 2:08-cv-01035-LRR.

and October 20, 2008. The requests varied from $615,000 to $1,500,000, with the majority of the requests in excess of $1 million. Each request certified that Agriprocessors was in compliance with the Credit Agreement and was signed by or on behalf of Defendant.

During an interview on November 13, the sole accounts receivable employee at Agriprocessors told an ICE special agent that Defendant "would regularly divert customer payments on accounts receivable away from the 'sweep account' and into a different Agriprocessors account at a different bank." That is, rather than immediately posting the payment to Agriprocessors' accounting records and depositing the money in the sweep account at the Decorah Bank, some of the customer payments would be diverted to other Agriprocessors bank accounts. Agriprocessors would then write checks to Kosher Community Grocery, Inc. or, later, the Torah Education Program of Northeast Iowa. Defendant is the owner of Kosher Community Grocery and controlled the bank account at Torah Education Program of Northeast Iowa.

Periodically, checks were written from Kosher Community Grocery and Torah Education Program back to Agriprocessors. Those checks were then deposited in the sweep account at the Decorah Bank, as though they represented customer payments on accounts receivable. According to Government's Exhibit 4, from August 3, 2007 to April 4, 2008, approximately $10.9 million was paid by Agriprocessors to Kosher Community Grocery. From August 2, 2007 to March 6, 2008, Kosher Community Grocery paid Agriprocessors approximately $10.7 million. According to Government's Exhibit 6, from January 17, 2008 to May 16, 2008, Agriprocessors paid Torah Education Program approximately $8.3 million. From August 2, 2007 to May 15, 2008, Torah Education Program paid Agriprocessors approximately $9.7 million. The Chief Financial Officer ("CFO") for Agriprocessors later admitted to a First Bank representative that Agriprocessors was "borrowing" against account receivables without First Bank's knowledge or permission.

The accounts receivable employee told the ICE special agent that she would normally speak with Defendant before crediting the customer payments in Agriprocessors' accounting system. Defendant would tell the employee what portion of the customer checks should be deposited in Agriprocessors' general account, rather than being deposited in the sweep account at Decorah Bank. On some occasions, Defendant would identify the specific checks to be diverted, while on other occasions Defendant would provide an amount to be diverted and the employee would select a group of checks which added up to the approximate dollar figure expressed by Defendant.

On other days, Defendant would tell the employee to issue checks from Kosher Community Grocery or Torah Education Program to Agriprocessors, to be deposited in the sweep account, to make up for checks that had previously been diverted. Defendant instructed the employee to make sure that all the checks were for odd (seemingly random) dollar amounts, and that the combination of checks did not add up to a whole dollar amount. The Government notes that Exhibits 5 and 7 show consecutively numbered checks issued on the same day from the Kosher Community Grocery and Torah Education Program accounts, which it believes supports the employee's description of the events.

According to the accounts receivable employee, the transactions described above were recorded on an Excel spreadsheet. The Excel spreadsheets were then stored on a thumb drive--a portable media storage device--that was given to the employee by Defendant. The employee told the ICE special agent that Defendant specifically told the employee to use this thumb drive to store the check information. On October 29, the day before Defendant was arrested initially, he asked for and took the thumb drive from the accounts receivable employee. The employee has not seen the thumb drive since that day and does not know what Defendant did with it. At the same time, Defendant asked for and took a folder that the employee used to store copies of the customer checks which had been diverted and not yet posted to customer accounts in Agriprocessors' accounting system. On October 31, the day after Defendant was arrested and released, he told the employee

to delete any checks that had not been entered into Agriprocessors' computer accounting system and told the employee to "clean" the employee's desk. The employee interpreted that instruction to mean removing any items relating to the information stored on the thumb drive. The employee followed Defendant's instructions.

The Government also proffered at the hearing that another accounting employee who regularly prepared spreadsheets related to diverted checks was told by Defendant on November 5, 2008 to "clean up her desk," which the employee understood to be an instruction to shred the spreadsheets. The employee complied. Defendant proffered that there was a general discussion in the office regarding retrieving personal property in advance of the appointment of a receiver.

Based in part on the information set forth above, on November 14, 2008, the Government filed a criminal complaint charging Defendant with bank fraud.[5] A warrant was issued for Defendant's arrest. He was arrested on the same day and brought before the Court. The Government requested that Defendant be detained prior to trial. The Court ordered Defendant detained pending the instant hearing.

At the time of Defendant's arrest on November 14, a search was conducted of his residence. Agents discovered more than $20,000 in cash, plus 20-25 silver coins. The money was not seized, however, because it was beyond the scope of the search warrant. Most of the money was apparently found in a closet in the master bedroom. Agents discovered a box containing a large number of $1 bills. At the time of hearing, Defendant proffered that the money represented charitable donations and that if one intended to flee, he would not take thick stacks of $1 bills. Also found on the floor of the closet was a bag containing a substantial amount of cash (in $100 bills), a "travel pouch" to be worn on one's person (containing several thousand dollars), passports of some of Defendant's children, and Defendant's birth certificate. Defendant proffered that his financial condition "was deteriorating rapidly" and he was saving cash to meet his family's financial needs.

---

[5] *United States of America v. Sholom Rubashkin*, Case Number 1:08-mj-00381-JSS.

Defendant is 49 years old. He was born and raised in Brooklyn, New York, but moved to Postville with his family in 1993. Defendant is married and has ten children, eight of whom continue to reside in Postville. Defendant is particularly close to his 15-year-old son, who suffers from physical and mental disabilities and is specially reliant on his father. Defendant was instrumental in establishing the assets necessary to attract Jewish workers to Postville and was described by his attorney as the "backbone of the Jewish community" in Postville.

In support of his request that he be released on certain conditions, Defendant provided evidence of financial support offered by others. According to Defendant's Exhibit 4, more than 30 persons in the Postville area are willing to pledge the equity in their homes (totaling approximately $2 million) to secure an appearance bond on Defendant's behalf. It was also represented that two relatives are willing to pledge the equity in their homes, totaling approximately $1.5 million. Also, a cash bond of $225,000 could be deposited on Defendant's behalf.

Defendant also submitted approximately 275 letters of support from the Postville area and throughout the nation, vouching for Defendant's good character. The letters reference Defendant's devotion to his family and his service to the Jewish community. All of the writers express confidence that Defendant is not a flight risk.

## DISCUSSION

The release or detention of a defendant pending trial is governed by the Bail Reform Act of 1984, 18 U.S.C. § 3142. In *United States v. Salerno*, 481 U.S. 739 (1987), the United States Supreme Court upheld the constitutionality of the Bail Reform Act of 1984, while noting that "[i]n our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." 481 U.S. at 755.

If the government moves to have a defendant detained prior to trial, the court must undertake a two-step inquiry. *United States v. Friedman*, 837 F.2d 48, 49 (2d Cir. 1988). It must first determine by a preponderance of the evidence whether defendant has been

7

charged with a certain type of offense listed in 18 U.S.C. § 3142(f)(1), or that the defendant presents certain risk factors, as identified in § 3142(f)(2). *Id.* Once this determination has been made, the court then determines whether any condition or combination of conditions will reasonably assure the defendant's appearance at trial and the safety of the community. *Id.*

In seven enumerated circumstances, a judicial officer must hold a hearing to determine whether any release condition or combination of release conditions will reasonably assure the appearance of defendant as required and the safety of the community. 18 U.S.C. § 3142(f). The first five enumerated circumstances refer to "offense types," such as crimes of violence, serious drug offenses, and felonies involving minor victims. 18 U.S.C. § 3142(f)(1). Those circumstances have no application here. The last two enumerated circumstances where a hearing is required involve "risk factors." A hearing must be held --

> Upon motion of the attorney for the Government or upon the judicial officer's own motion, in a case that involves--
>
> (A) a serious risk that such person will flee; or
>
> (B) a serious risk that such person will obstruct or attempt to obstruct justice, or threaten, injure, or intimidate, or attempt to threaten, injury, or intimidate, a prospective witness or juror.

18 U.S.C. § 3142(f)(2). It is these provisions upon which the Government relies in seeking a detention hearing in this case.

If, following a hearing, "the judicial officer finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community," then the judicial officer must order the defendant detained pending the trial. 18 U.S.C. § 3142(e). A finding that no condition or combination of conditions will reasonably assure the safety of the community must be supported by clear and convincing evidence. 18 U.S.C. § 3142(f). A finding that no

8

condition or combination of conditions will reasonably assure the defendant's appearance, however, must only be established by a preponderance of the evidence. *United States v. Orta*, 760 F.2d 887, 891 (8th Cir. 1985).[6]

In determining whether any condition of combination of conditions will reasonably assure Defendant's appearance as required and the safety of the community, the Court must take into account the available information concerning (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against Defendant; (3) the history and characteristics of Defendant, including (a) Defendant's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings, and (b) whether, at the time of the current offense or arrest, Defendant was on probation, parole, or other pretrial release; and (4) the nature and seriousness of the danger to the community that would be posed by Defendant's release. 18 U.S.C. § 3142(g). *See also United States v. Abad*, 350 F.3d 793, 797 (8th Cir. 2003).

Turning to the facts in the instant action, Defendant is charged with bank fraud. The Court notes that it does not involve a crime of violence, controlled substances, or minor victims. The evidence against Defendant, however, would appear to be substantial. Not only have the transactions left a paper trail, the employee responsible for accounts receivable will apparently be able to provide detailed testimony regarding the scheme and Defendant's role in it.

---

[6] "Perhaps counter-intuitively, the government's evidentiary burden is lesser to prove a flight risk than to prove risk of harm." *United States v. Kisling*, 334 F.3d 734, 735, n.3 (8th Cir. 2003) (citing *Orta* ).

Defendant has lived in Postville with his family for 15 years.[7] Defendant came to Postville to operate the business purchased by his father. The company is for sale, however, and negotiations are ongoing with a number of potential purchasers. According to an affidavit submitted by Bernard S. Feldman, Agriprocessors' current CEO, "I expect that such negotiations will be fruitful [and] completed in the very near future." Accordingly, Defendant's future ties to Postville are unclear.

According to the Pretrial Services Report, Defendant has no prior criminal record. The Government suggests that Defendant was "implicated" in a prior bank fraud case in the Northern District of Iowa and he loaned the defendant in that case $82,500 to make restitution. Agriprocessors also apparently agreed to pay $1.4 million to settle a civil fraud claim in New York. Based on the proffer, however, the Court is unable to determine what role, if any, Defendant may have played in those prior actions. Accordingly, the Court has given no weight to that evidence.

The Court believes it is significant that during a search of Defendant's home on November 14, ICE agents found a bag containing a substantial amount of money, together with Defendant's birth certificate and the passports of some of his children. There were two "lock boxes" found in Defendant's closet which were open and empty. As the Government notes, one would expect thousands of dollars in cash and other important papers to be kept in the lock boxes, rather than a travel bag.

Under Israel's "Law of Return," any Jew and members of his family who have expressed their desire to settle in Israel will be granted citizenship. At the time of hearing, the Government proffered that two supervisors at Agriprocessors fled following the search on May 12, 2008. It is believed that Hosam Amara, a Muslim with Israeli citizenship, fled to Israel, possibly through Canada. During the week prior to his initial arrest, Defendant was traveling in Canada, returning to the United States on October 28. Defendant

---

[7] For three years prior to that, Defendant lived in Minneapolis and worked in Postville.

proffered that he was in Canada to talk to a potential investor for Agriprocessors, but a border contact report indicated that Defendant "visited friend in Toronto, Canada for one week. Conducted no business."

The Court cannot conclude by clear and convincing evidence that there is no combination of conditions which will reasonably assure the safety of the community if Defendant were released prior to trial. After having carefully considered all of the evidence and arguments of counsel, however, the Court concludes that Defendant is a serious risk of flight. The Government has met its burden of proving by a preponderance of the evidence that there is no condition or combination of conditions which will reasonably assure Defendant's appearance at the time of trial. Therefore, pursuant to 18 U.S.C. § 3142(e), the Court concludes that Defendant should be detained prior to trial.

## ORDER

IT IS THEREFORE ORDERED as follows:

1. The Defendant is committed to the custody of the Attorney General for confinement in a corrections facility separate, to the extent practicable, from persons awaiting or serving sentences or being held in custody pending appeal.

2. The Defendant shall be afforded reasonable opportunity for private consultation with counsel.

3. On order of a Court of the United States or on request of an attorney for the Government, the person in charge of the corrections facility in which the Defendant is confined shall deliver the Defendant to the United States Marshal for the purpose of an appearance in connection with a court proceeding.

4. The time from the Government's oral motion to detain (November 14, 2008) to the filing of this Ruling (November 20, 2008) shall be excluded in computing the time within which the trial must commence pursuant to the Speedy Trial Act. 18 U.S.C. § 3161(h)(1)(F).

5.    Pursuant to 18 U.S.C. § 3145(b), Defendant is advised that he may file a motion for revocation or amendment of this Order, directed to Chief Judge Linda R. Reade.

DATED this 20th day of November, 2008.

_____
JON STUART SCOLES
United States Magistrate Judge
NORTHERN DISTRICT OF IOWA