1

```
 1          IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF IOWA
 2

 3   UNITED STATES OF AMERICA,)
                             )
 4           Plaintiff,      )   08-CR-1324
                             )
 5     VS.                   )   08-MJ-381
                             )
 6   SHOLOM RUBASHKIN,       )
                             )
 7           Defendant.      )

 8                  APPEARANCES:

 9   ATTORNEYS PETER E. DEEGAN, JR., and MATTHEW
     COLE, Assistant U.S. Attorneys, Suite 400,
10   401 First Street S.E., Cedar Rapids, Iowa
     52401, appeared on behalf of the United States.
11
     ATTORNEY F. MONTGOMERY BROWN, Brown & Scott,
12   1001 Office Park Road, Suite 108, West Des
     Moines, Iowa 50265,
13                       AND
     ATTORNEY BARUCH WEISS, Arent Fox, 1050
14   Connecticut Avenue N.W., Washington, DC 20036,
     appeared on behalf of the Defendant.
15

16

17        ARRAIGNMENT AND DETENTION HEARING,

18   held before the Hon. Jon S. Scoles on the 19th

19   day of November, 2008, at 4200 C Street S.W.,

20   Cedar Rapids, Iowa, commencing at 1:59 p.m.

21

22

23       Patrice A. Murray, CSR, RPR, RMR, FCRR
             United States District Court
24                4200 C Street S.W.
             Cedar Rapids, Iowa 52404
25                (319) 286-2324
```

2

```
 1                           INDEX

 2                          EXHIBITS

 3                                          O      R

 4     Gov. Exhibit Nos. 1 through 7       10     10

 5     Gov. Exhibit Nos. 13 through 30     10     10

 6     Gov. Exhibit Nos. 8 and 9           20     20

 7     Gov. Exhibit Nos. 10, 11, and 12    22     22

 8     Def. Exhibit No. 1                  56     56

 9     Def. Exhibit No. 2                  33     33

10     Def. Exhibit No. 3                  46     46

11     Def. Exhibit No. 4                  39     39

12     Def. Exhibit No. 5                  37     38

13     Def. Exhibit No. 6                  51     52

14

15

16

17

18

19

20

21

22

23

24

25
```

3

THE COURT:  There are two matters now
before the Court, both entitled United States
of America versus Sholom Rubashkin.  The first
is number 08-CR-1324, and the second is
08-MJ-381.  I want to review -- well, first of
all, let me indicate that the government is
represented at this hearing by Assistant United
States Attorney Peter Deegan, Jr., and
Assistant United States Attorney Matt Cole.
The defendant appears personally and is
represented by Attorney Montgomery Brown, and
is also represented by Attorney Baruch Weiss.

MR. WEISS:  Yes.  And, thank you,
Your Honor, for granting the application.

THE COURT:  You're welcome.  First, I
want to review the procedural history just a
bit to make sure that we all understand what
the hearing today is about.  The file reflects
that in magistrate number 08-MJ-363, a criminal
complaint was filed on October 30, 2008.  The
defendant was arrested that same day, was seen
by me the same day, and was released by me
under an order setting conditions of release.

On November 13, a superseding
indictment was filed -- or returned by the

4

grand jury relating to the charges that were
brought in that original criminal complaint.
And it was termed a "superseding indictment"
because it was a new indictment in relation to
another named defendant.  The arraignment on
that superseding indictment was initially set
for this past Monday; however, on the following
day, November 14, the new criminal complaint
was filed.  That's in number 08-MJ-381.  The
defendant was arrested that same day, and
appeared before me the same day.  And this was
last Friday.  And I ordered that the defendant
be detained pending a detention hearing today.
I also set a preliminary hearing today.  I also
entered an order, which continued the
arraignment on the first case from Monday until
today.

And then meanwhile, on Friday, after
the second case was filed, the Probation Office
filed a Memorandum of Noncompliance, which was
set for initial appearance today.  After all of
that happened, the government made an oral
motion to continue the preliminary hearing that
was set for today in the second case, and that
was agreed to by defendant's counsel.  And the

5

Court then entered an order which reset the
preliminary hearing for November 26, which I
think is next week.

So there are actually three things
that are scheduled for today, if I have this
all straight.  Number 1 is the arraignment on
the superseding indictment in cause number
08-CR-1324.  That's the initial three charges
that were brought.  The second thing that's set
for hearing today is the detention hearing in
the second case, the one that is the criminal
complaint.  And the third thing is the initial
appearance on the Memorandum of Noncompliance.

Now, what makes the most sense to me,
I guess, is that we first take care of the
arraignment on the indictment, get that out of
the way.  The detention hearing, obviously, is
the principal thing that we're doing here
today.  Even though the noncompliance
memorandum was set for initial appearance, the
allegation contained in the noncompliance
memorandum is the allegations that are made in
the second criminal complaint, and so it would
seem most efficient to simply agree that the
noncompliance memorandum and the request to

6

revoke the pretrial release in the first case
would be held simultaneously with the detention
hearing in the second case, and presumably
either the defendant would be detained in both
cases or released under conditions in both
cases.

Mr. Deegan, does that all make sense
to you?

MR. DEEGAN:  Yes, Your Honor.

THE COURT:  And I guess -- Mr. Weiss
or Mr. Brown, who is speaking for the defendant
today?

MR. WEISS:  If the Court will allow
us, we'll divide today's presentation.  If -- I
understand it's up to the Court to allow us to
do that.  I would so request.  The Court has
been indulgent so far.

THE COURT:  I don't have any
objection to that.  Obviously, you both can't
examine the same witness, but otherwise you can
split up the work.

MR. WEISS:  Thank you.  Yes, that is
acceptable to us.

THE COURT:  All right.  Let's talk
about the arraignment first then.  This would

7

1   be case number 08-CR-1324.  The grand jury
2   returned a superseding indictment on
3   November 13, 2008.
4            Mr. Weiss, has the defendant been
5   provided with a copy of the superseding
6   indictment?
7            MR. WEISS:  Yes, Your Honor.
8            THE COURT:  And is he charged in his
9   true and correct name?
10           MR. WEISS:  Yes, omitting his middle
11  name, but, yes.
12           THE COURT:  Is it spelled correctly
13  on the superseding indictment?
14           MR. WEISS:  Yes.
15           THE COURT:  The defendant is, of
16  course, entitled to a reading of the indictment
17  in order to make sure that he understands the
18  nature of the charges being brought against
19  him --
20           MR. WEISS:  We waive that.
21           THE COURT:  -- or he can waive that
22  requirement.
23           MR. WEISS:  We waive that.
24           THE COURT:  At this time, then, the
25  defendant is required to enter the plea to the

8

1   charges, and his plea can be either guilty or
2   not guilty.
3            MR. WEISS:  The defendant will enter
4   a not guilty plea.
5            THE COURT:  The Court will record the
6   defendant's plea of not guilty to Counts 1, 2
7   and 3 of the superseding indictment in cause
8   number CR 08-1324.  This matter will be set for
9   trial before Chief District Judge Linda R.
10  Reade during the two-week period beginning on
11  January 20, 2008.  There will be a status
12  hearing held before me at noon on December 23,
13  2008.
14           Are the parties able to agree to the
15  standard discovery order, Mr. Deegan?
16           MR. DEEGAN:  Yes, Your Honor.
17           THE COURT:  Mr. Weiss?
18           MR. WEISS:  Yes, Your Honor.
19           THE COURT:  The Court will enter the
20  standard discovery order in this case.  Is
21  there anything else that needs to be addressed
22  regarding the arraignment on the indictment,
23  Mr. Deegan?
24           MR. DEEGAN:  No, Your Honor.
25           THE COURT:  Mr. Weiss?

9

1            MR. WEISS:  No, Your Honor.
2            THE COURT:  All right.  At this time,
3   then, we turn to the detention hearing which
4   was scheduled for today, and is scheduled for
5   today and -- in the second case, number
6   08-MJ-381.  And by agreement of counsel, this
7   matter will also come on for hearing on the
8   request of the Probation Office to revoke
9   defendant's pretrial release in the first case.
10           Are the parties prepared to proceed
11  with the hearing at this time?
12           MR. DEEGAN:  Yes, Your Honor.
13           MR. WEISS:  Yes, Your Honor.
14           THE COURT:  Mr. Deegan.
15           MR. DEEGAN:  Thank you, Your Honor.
16  Prior to today's hearing, I've had an
17  opportunity to meet with both defense counsel,
18  and they have agreed that we may proceed by
19  proffer.  We have agreed that they may proceed
20  by proffer.  So with the Court's permission,
21  I'd like to go ahead and do that at this time.
22           THE COURT:  You may.
23           MR. DEEGAN:  First of all, I've
24  provided the Court with Government's Exhibits
25  No. 1 through 30, and it's my understanding

10

1   with -- that with the exception of Exhibits 8
2   through 12, there are no objections.  And I'd
3   offer those, the ones except 8 through 12, into
4   the record at this time.
5            THE COURT:  Any objection to the
6   receipt of Exhibits 1 through 7 and 13 through
7   30?
8            MR. WEISS:  No objection, Your Honor.
9            THE COURT:  All right.  Those
10  exhibits will be received.
11           (Whereupon, Government's Exhibits 1
12  through 7 and 13 through 30 were received.)
13           MR. DEEGAN:  Thank you, Your Honor.
14  And with the Court's permission, this proffer
15  may take a while, would the Court mind if I sat
16  while I did so.
17           THE COURT:  I don't have any
18  objection to that.
19           MR. DEEGAN:  Your Honor, the
20  government would proffer that if Special Agent
21  Mike Fischels were to testify here today, he
22  would say that the facts set forth in the two
23  affidavits in support of the criminal
24  complaints in these cases -- that being the
25  original criminal complaint and the harboring

**11**

1  and document fraud case, as well as the bank
2  fraud case -- that those facts remain true to
3  the best of his understanding, with one
4  clarification.  That on the bank fraud, that
5  it's our understanding that First Bank Business
6  Capital is actually a wholly-owned subsidiary
7  of First Bank, and that it's First Bank that's
8  FDIC insured.
9        At this time, I direct the Court's
10 attention to Government's Exhibits 1, 2, and 3,
11 and these are the complaints -- the complaint
12 filed in the civil lawsuit by First Bank
13 Business Capital against Agriprocessors and
14 others, including Sholom Rubashkin, essentially
15 related to the loan and the line of credit
16 underlying the bank fraud case.  I also direct
17 the Court's attention to the declaration of
18 Mr. Philip Lykens, which is Exhibit 2: and
19 Government's Exhibit 3 in this case, Exhibit I
20 in the civil case, which are the -- what I
21 refer to as the October checks that were the, I
22 guess, primary basis for the civil complaint.
23       Regarding the bank fraud case, the
24 government has gathered additional evidence
25 confirming the defendant's actions.  Just

**12**

1  yesterday, Special Agent Fischels participated
2  in an interview with Philip Lykens, who is the
3  declarant in Exhibit 2, and the primary person
4  responsible for the Agriprocessors loan at
5  First Bank Business Capital.  I'd like to
6  highlight some of the things that he said
7  during that interview.  First of all, that upon
8  discovering the diversion of customer payments
9  that are addressed in the criminal
10 complaint -- and that would essentially be
11 through the bounced October checks, a portion
12 of them anyway -- he traveled to Postville and
13 met with the defendant and other
14 representatives of Agriprocessors.  That was on
15 October 23 of 2008.  With regard to the October
16 checks that had been discovered as of that
17 time, that would be over $900,000 worth of
18 bounced checks going from Luana Bank and being
19 deposited into the depository account at
20 Decorah Bank & Trust, he had a discussion with
21 the defendant.  And during the course of that
22 discussion, the defendant acknowledged that
23 those checks represented previously received
24 customer payments.  In addition, the defendant
25 acknowledged to Mr. Lykens that there were

**13**

1  additional checks out there, bringing the total
2  amount to approximately $1.4 million.
3        Mr. Lykens attempted to find out who
4  had directed the diversion of the customer
5  payments and who had directed the creation of
6  the October checks.  He tried several times to
7  ask the group who was responsible, and never
8  did get an answer.  When asked whether the bank
9  was ever able to reconcile the amounts of the
10 checks with the amounts of the customer
11 payments that the -- that Agriprocessors had
12 identified, he indicated that he was not able
13 to do so, that the checks -- the amounts on the
14 checks did not correspond with those customer
15 payments, and they seemed to be -- had been
16 created in random amounts, to appear random in
17 any event.  Agriprocessors' chief financial
18 officer was present.  And during the
19 discussions, the CFO acknowledged that because
20 of the diversion, Agriprocessors had been
21 borrowing against accounts receivable that had
22 already been paid.
23       A couple other relatively minor
24 points.  Lykens did say that as of Wednesday,
25 October 29, Agriprocessors was very aware that

**14**

1  the bank would be insisting upon the
2  appointment of either a receiver or a trustee.
3  And Agriprocessors did, in fact, agree to the
4  appointment of a receiver on October 31, 2008.
5  Lykens said that during the lifetime of the
6  loan, including October 2008, it was Sholom
7  Rubashkin who made the ultimate decisions as to
8  Agriprocessors's day-to-day finances.
9        Also, yesterday Special Agent
10 Fischels participated -- or excuse me, another
11 witness appeared for a grand jury appearance
12 and testified in summary as follows.  This
13 information was provided by the AUSA that
14 presented the testimony.  This was another
15 account clerk from Agriprocessors, separate
16 from the accounts receivable clerk referred to
17 in the criminal complaint affidavit.  This
18 person indicated that she had some involvement
19 with regard to the checks -- checks that had
20 been diverted by the accounts receivable person
21 referenced in the complaint.  And I'll explain
22 that a little bit further in just a moment.
23 She said that on November 5 of this year -- she
24 recalls the date because she took her kids to
25 the doctor that day -- that the defendant came

## 15

1  by and asked her to clean up her desk.  And as
2  a result of that directive, she shredded an
3  Excel spreadsheet.  The Excel spreadsheet
4  contained information about customer checks
5  which had been posted in Agriprocessors's
6  accounting system, as well as customer checks
7  that had not been posted.  The nonposted checks
8  included a customer referred to as Doheny
9  Wholesale -- and I have the spelling as
10 D-O-H-E-N-Y -- as well as another customer,
11 City of Glatt.  She had to get the information
12 about the nonposted checks from the accounts
13 receivable clerk referenced in the complaint
14 affidavit.  She was working with both the
15 posted and the nonposted checks because she was
16 trying to reconcile how much those customers
17 actually owed on their accounts.
18         Normal procedure for this person
19 would have been to shred the Excel spreadsheets
20 after about six months.  This was a document
21 that she was working on at the time that ended
22 up being shredded.  And again, just so the
23 record's clear, this is a different person from
24 the accounts receivable employee referenced in
25 the complaint.

## 16

1          That person also told a similar story
2  with regard to a directive to clean up her desk
3  by Sholom Rubashkin.  In the complaint, that
4  person is noted as stating that on Wednesday,
5  October 29, Sholom Rubashkin asked for and took
6  a thumb drive that she had used to store Excel
7  spreadsheets showing all customer checks
8  received by Agriprocessors, both posted and not
9  posted.  At the same time he also asked for and
10 took a folder that the clerk had used to store
11 copies of customer checks which had been
12 diverted and not yet posted to the customer
13 accounts in Agriprocessors's accounting system.
14 That was the day before Mr. Rubashkin was
15 arrested.
16         The day after, on October 31, 2008,
17 according to that same accounting clerk
18 referenced in the complaint, Sholom Rubashkin
19 told that person to delete any record of the
20 checks that she had entered into
21 Agriprocessors's computer accounting system but
22 which had not yet been posted in the accounting
23 system to the customer accounts.  That was the
24 same day that she received a directive to clean
25 her desk.  As a result of the directive, she

## 17

1  did delete the checks in the accounting system
2  as directed, and she also cleaned up matters on
3  her desk.
4          In addition -- this isn't in the
5  criminal complaint affidavit -- according to
6  that same clerk, the accounts receivable clerk,
7  that she had been directed by Sholom Rubashkin
8  not to give information to First Bank Business
9  Capital's auditor when he would come by.  And I
10 don't know if the correct term, quite frankly,
11 is "auditor," but the person from the bank that
12 would come to review Agriprocessors's
13 accounting approximately twice a year.  Sholom
14 Rubashkin told her that if he had a question,
15 that she was to tell him that she would have to
16 get back to him.
17         There's a reference in the criminal
18 complaint to checks going to and from both
19 Kosher Community Grocery and Torah Education,
20 and I direct the Court's attention to Exhibits
21 4 through 7.  Those are the checks at issue, or
22 at least the ones that were referenced in the
23 criminal complaint.  In addition, if the Court
24 would refer to Exhibit 5 and Exhibit 7, those
25 are the two lists that were shown to the

## 18

1  accounts receivable clerk as referenced in the
2  complaint affidavit.  And this may be subject
3  for argument, but if the Court notes, checks
4  going from either of these institutions to
5  Agriprocessors and being deposited into the
6  Decorah Bank & Trust accounts, that there are
7  several instances where there are a series of
8  checks having sequential check numbers.  This
9  is consistent with the statements from the
10 accounts receivable clerk that she was asked by
11 Sholom Rubashkin to break up these deposits
12 into several checks and reflecting odd amounts.
13 And again, I'm referring to the 5 and 7 where
14 the checks are actually going from either
15 Kosher Community or Torah Education back to
16 Agriprocessors into the depository account.
17         And not to confuse things, but I'm
18 kind of using the depository account and sweep
19 account interchangeably.  It's the same account
20 at Decorah Bank & Trust.  I also have -- and
21 these haven't been admitted into the record --
22 a judgment from the criminal case involving a
23 Teresa Downing from March of 2004, where she
24 was convicted of making false entries in a
25 bank's book and bank fraud.  And that's Exhibit

19

8.

In addition, Exhibit 9 is a promissory note agreeing to pay Sholom Rubashkin, the defendant, back approximately $82,000 in restitution that she was ordered to pay in that case.  And I proffer to the Court that, although Sholom Rubashkin was not implicated in the portion of Downing's case where she took $82,000 of the bank's money, he was implicated in the other portion, essentially, at the request of Sholom Rubashkin, taking large checks and sticking them in a desk drawer after they had already been given credit on those checks.  And then --

MR. BROWN:  Excuse me, Your Honor, we object to the information that's being proffered in Exhibits 8 and 9, both under Rule 403 and for the reason that this is not new information.  The government was fully aware of this information before the prior detention hearing, so it should not in any way be reasonably calculated to affect the Court's decision in this particular instance when they already knew about it.

MR. DEEGAN:  Your Honor, I don't

20

dispute that the government already knew about it; however, it is admissible.  The Rules of Evidence do not apply in this type of hearing, and it does go to show the defendant's attempting to influence witnesses in a prior bank fraud.

THE COURT:  First of all, with respect to Exhibits 8 and 9, are you offering those?

MR. DEEGAN:  Yes, I am.

THE COURT:  Any objection?

MR. BROWN:  Yes, Your Honor, for the reasons previously stated.

THE COURT:  And those objections will be overruled.  Exhibits 8 and 9 are received.

(Whereupon, Government's Exhibits 8 and 9 were received.)

THE COURT:  With respect to the proffer, it's a little difficult for me to resolve issues with respect to the proffer because I don't know the nature of the agreement between the parties as to the extent of the proffer.  It sounds like there wasn't any agreement that the government would proffer additional information on this subject, but --

21

MR. BROWN:  Well, there was an agreement that they would attempt to proffer the information regarding the items that I have objected to.

MR. DEEGAN:  If I could have a moment with counsel.

(Counsel conferred.)

MR. DEEGAN:  I talked to counsel, and he's agreed to the following statement regarding the Teresa Downing case:  That Defendant Sholom Rubashkin was implicated in what was essentially a check kiting scheme, which was the subject of one of her guilty pleas.

In addition, I'd direct the Court's attention -- and again, these two items are not in the record at this time -- to Government's 10, 11, and 12.  The documents speak for themselves, but they are two filings in a fraudulent conveyance case in bankruptcy court, as well as a newspaper article recounting some of the defendant's testimony in that case.  Essentially, that case involved a company that was going bankrupt; large amounts of money were transferred to Agriprocessors for no apparent

22

legitimate reason; and ultimately, Agriprocessors ended up settling the fraudulent conveyance claim by paying -- and I don't know if I have the number right -- I think it's $1.4 million, back to the bankruptcy estate for the benefit of the creditors.

THE COURT:  Are you offering 10, 11 and 12?

MR. DEEGAN:  I am, Your Honor.

THE COURT:  Any objection?

MR. BROWN:  Yes, Your Honor.  We object to 10 and 11 on the grounds that this is not newly discovered.  This was known by the government prior to the prior detention hearing.  I object to 12 on the same basis, and, in addition, that the Des Moines Register article is unreliable.

THE COURT:  All right.  The -- the objections are overruled.  10, 11 and 12 are received.

(Whereupon, Government's Exhibits 10, 11, and 12 were received.)

THE COURT:  I would note, however, that Exhibit 12 is a newspaper article, and while the hearsay rule doesn't apply to this

23

1 proceeding, obviously, the Court considers the
2 hearsay nature of the exhibit in weighing its
3 value.
4        MR. DEEGAN:  Law enforcement agents
5 searched the defendant's residence on the day
6 of his arrest, on November 14, 2008.  They
7 found several items of interest.  There was
8 approximately -- and this is a very approximate
9 number, and I'll explain why in a moment --
10 about $20,000 in cash, as well as silver coins.
11 The agents did not take the time to count up
12 all the cash, in part because it was not to be
13 seized under the warrant, and there was an
14 agreement to try to get out of the residence by
15 sundown.  It was a Friday, and a religious
16 holiday was going to begin.
17        In the kitchen area of the house --
18 and I'll just hit some of the highlights, which
19 I'd ask the Court to consider.  In the kitchen
20 area of the house was an envelope with hundred
21 dollar bills in it, on the counter.  In the
22 upstairs office area, there were approximately
23 twenty to twenty-five silver coins.  In the
24 master bedroom, that's where most of the money
25 was found.  It was mostly in a bag on the floor

24

1 of the closet.  I'll discuss that in a moment
2 as well.  However, in addition, in the master
3 bedroom there was a box of dollar bills on the
4 floor.  In the bag on the floor of the closet
5 were several envelopes of money, containing
6 several thousands of dollars, mostly in $100
7 bills.  There was what could only be described
8 as a travel pouch.  This is a fabric bag
9 that -- of the sort that a traveller would put
10 under their clothing.  It also had thousands of
11 dollars in it.  There were original birth
12 certificates for both the defendant and his
13 wife.  There was also approximately three or
14 four passports appearing to be passports for
15 the defendant's children.  And there were at
16 least two original social security cards.
17 These were all in this bag in the closet.
18        At this time I'd like to refer the
19 Court's attention to Exhibits 13 through 23,
20 and go through those briefly and describe for
21 the record what those are.  Exhibits 13 and 14
22 are still photographs taken of the box of
23 dollar bills that was discovered in the master
24 bedroom.  Exhibit 15 is an overview of the bag
25 that was found in the closet.  And the

25

1 remaining 15 through 23 are all stills taken
2 from a video of the search.  15 is, as I said,
3 is an overview of the bag.  16 is an envelope
4 containing hundred dollar bills, seized from
5 the bag -- or excused me, discovered in the
6 bag, not seized.  Number 17 is that travel
7 pouch, and the Court can see there's a strap
8 hanging down.  And again, stacks -- several
9 thousands of dollars in larger bills, mostly
10 hundreds, in that travel pouch, also taken
11 from -- or excuse me, found in the bag.  18 is
12 another photo of the same.  And the Court can
13 see there's a passport on the table near
14 another agent who is looking at items.  Exhibit
15 19 shows at least two of the passports, as well
16 as some birth certificates and other documents,
17 again, all discovered in the bag.  Exhibit 20
18 shows a large roll of bills, again, that was
19 seized -- or found in the bag.  21 shows at
20 least one certificate, birth certificate, that
21 has at least one passport.  And the Court can
22 also see a signature stamp that was with these
23 items.  22 is a similar picture showing, again,
24 items from the bag: certificates, birth
25 certificates, a passport, and again the

26

1 signature stamp.  And then 23 is an close-up
2 photograph -- image taken from the video,
3 rather, of a certificate of birth for the
4 defendant from the City of New York, Department
5 of Health, Bureau of Vital Records.
6        In the same closet with this bag were
7 three lockboxes.  Two of the lockboxes were
8 open and empty.  The third lockbox didn't have
9 anything of particular interest in it, the one
10 that was locked.
11        Also discovered during this search
12 were -- was a hotel receipt for a stay in
13 Jerusalem in late December of 2007.  And I
14 direct the Court's attention to photographs in
15 the record as Government's 24 and 25.  In
16 addition, Government's 26 shows a travel
17 itinerary for what appears to be travel for the
18 defendant and his wife on that same trip.
19 Agents have obtained additional evidence of the
20 defendant's recent travel to Canada.
21        Government's 27 is a record
22 documenting an encounter with the defendant on
23 October 28, 2008.  This would have been as
24 defendant was returning to the United States
25 from Canada and was encountered by Customs and

27

1   Border Protection in Toronto.
2         Your Honor, if the defendant were
3   released, he would be easily able to emigrate
4   to Israel under the Israel's right-to-return
5   law, and would be allowed what essentially is
6   a -- is, as a practical matter, dual
7   citizenship, although I think it's in the form
8   of a special type of visa granted for those who
9   are of Jewish heritage that come to Israel.
10        Exhibit 28 is some information from
11  the Israeli Knesset, their legislative body,
12  describing the Law of Return.  It also includes
13  a statement that a child and a grandchild of a
14  Jew, the spouse of a Jew, the spouse of a child
15  of a Jew, and the spouse of a grandchild of a
16  Jew, are subject to the same right of return.
17        Exhibit 29 is a document from the
18  Department of State website indicating that, in
19  essence, a person does not necessarily risk
20  losing their US citizenship if they were to go
21  to another country under such circumstances.
22  In this case, there is information that two
23  other managers have fled to Israel in the wake
24  of the May 12 search.  Hosam Amara, a manager
25  in the poultry area, is a Muslim with an

28

1   Israeli citizenship, a dual citizen.  He was
2   notified early on that he was a target.  In
3   fact, the government had precharge discussions
4   with him.  Several sources have indicated that
5   he and his family have now fled to Israel,
6   possibly through Canada.  He's been in contact
7   with several people here in the United States,
8   as recently as today.
9         In addition -- and before I move on,
10  I'd offer what's been admitted -- Government's
11  30 is simply a press release on the part of the
12  government seeking information about Amara's
13  whereabouts.  This was released on July 3,
14  2008.  He remains a fugitive.  And I understand
15  that counsel can speak with more authority on
16  this issue than I can; however, it's the
17  government's understanding that the extradition
18  process from Israel is very difficult, in
19  particular for someone who may be able to gain
20  citizenship.
21        Another manager in the poultry
22  division, someone who was an Israeli citizen,
23  was called to the grand jury and provided a
24  photograph within weeks of the search.  Sources
25  indicate that he has been gone ever since.

29

1         Just today -- and this is moving onto
2   a different topic.  Just today, the
3   government's received information through an
4   attorney for a witness, saying that this person
5   is a customer of Agriprocessors up in the Twin
6   Cities area, and that on October 30, at about
7   nine a.m., that the defendant called him and
8   asked him not to send his customer payment to
9   Agri, but rather, send it to one of Agri's feed
10  suppliers.  That would have been right around
11  the time of the defendant's arrest.
12        And, Your Honor, just to follow-up on
13  that last point, that's important because, as
14  noted in the civil complaint, Agriprocessors is
15  required under the terms of its loan agreement
16  to deposit customer payments directly into the
17  Decorah Bank & Trust depository account.
18  They're supposed to do so without any diversion
19  at all and without changing the form in any way
20  at all.  And that's another example of
21  diversion just discovered yet today.
22        Your Honor, that completes the
23  government's proffer.
24        THE COURT:  Any objection to the
25  government's proffer?

30

1         MR. BROWN:  No, Your Honor.
2         THE COURT:  All right.  Would the
3   defendant like to make a proffer at this time?
4         MR. WEISS:  Yes, Your Honor.  Thank
5   you.  I'd like -- I'd like one moment, if I
6   can, to focus the Court's attention on the --
7   on the relevant statutory issues before I begin
8   on the factual proffer, if the Court will
9   indulge me.  And that is, the government is
10  seeking detention on two grounds, on risk of
11  flight and danger to the community because of
12  the alleged tampering evidence.
13        The first thing I'd like to stress,
14  of course, is that with respect to the
15  tampering, the government's burden is not the
16  ordinary preponderance burden.  But by the
17  language of the very statute, 3142, the
18  government is required to prove the facts
19  relating to safety of any member in the
20  community, to be supported by clear and
21  convincing evidence.  They have an especially
22  heavy burden by the very language of the
23  statute with respect to the tampering charge.
24        The other thing I'd also like to
25  point out, of course, is that -- whether it was

**31**

1 the immigration charge upon which the
2 defendant, Mr. Rubashkin, was arrested in
3 October or whether it's the bank fraud now,
4 neither of those charges alone or in
5 combination appear on the list of criminal
6 activity that justify detention, so that the
7 only factors that would justify detention here
8 are risk of flight or tampering.  And I say
9 that because a great deal of the proffer
10 related to the question of whether or not there
11 was a bank fraud here, and bank fraud is not an
12 offense for which ordinarily there can be
13 detention, unlike, for example, drug offenses
14 or crimes of violence.
15        Under the terms of the statute,
16 therefore, our inquiry has to be as follows:
17 Is Mr. Rubashkin a risk of flight?  Has the
18 government demonstrated that he is a risk of
19 flight?  And have they demonstrated not just
20 that he tampered with evidence but that there
21 is, in the language of the statute, a serious
22 risk -- the statute uses the word "serious" --
23 a serious risk that, if released, he will
24 obstruct evidence in the future.  Those are the
25 two inquiries.  Whatever they may believe they

**32**

1 have proved with respect to the past, it's our
2 view that if they can't show that, if released,
3 he will either flee or obstruct evidence, they
4 are not entitled to detention no matter what
5 their presentation has shown.  And I stress
6 that because much of their presentation --
7 well, some of their presentation did address
8 those two foci.  Not all of their presentation
9 did.  Some of it was simply out there to prove
10 the nature of the bank fraud.  And that -- I
11 stress that because I didn't want -- I didn't
12 want that to lead the Court off track of the
13 two inquiries that we have to engage.
14        I'd like to begin first to proffer
15 that which relates to risk of flight.  And the
16 first factor I'd like to address there is the
17 factor of ties to his family, ties to his
18 community.  And in that respect, I think that,
19 in the short time that we've had since his
20 arrest on Friday, we have put together a
21 package that demonstrates that he will not
22 flee.  And let me start first with the family.
23 There is, I think, no disputing that Mr. --
24 excuse me, Rabbi Rubashkin has lived in the
25 Postville area for well in excess of fifteen

**33**

1 years, between fifteen and twenty years; that
2 he is married; he is a devoted family man with
3 ten children, who live, except for the -- I
4 think almost all the --
5        (Whereupon, counsel conferred with
6 the Defendant.)
7        MR. WEISS:  Eight of the -- eight of
8 the ten children still live in Postville.  The
9 ties to the family are very strong.  Moreover,
10 in that respect, we marked as a defense exhibit
11 Defendant's Exhibit 2, which I'd like to offer
12 at this time, which goes to the family ties.
13 And this a letter from a Dr. Lederman submitted
14 to the Court on behalf of -- really, on behalf
15 not so much of Rabbi Sholom Rubashkin but on
16 behalf of one of his children.  And I'd like to
17 draw the Court's attention to that exhibit.
18        THE COURT:  Any objection with the
19 receipt of Exhibit 2?
20        MR. DEEGAN:  No, Your Honor.
21        THE COURT:  2 is received.
22        (Whereupon, Defendant's Exhibit 2 was
23 received.)
24        MR. WEISS:  And in that respect, Your
25 Honor, the -- the son -- one of the sons, the

**34**

1 children, of -- of Rabbi Rubashkin, by the name
2 of Moishe Rubashkin, who is fifteen years old,
3 suffers from some very serious medical issues.
4 And I think, as the doctor describes it, he was
5 born with global developmental delays; physical
6 disabilities, including muscular weakness; he
7 has mental disabilities, including illiteracy;
8 his intellectual age is four to five years;
9 impulse control issues; a lack of understanding
10 of his own strength.
11        He has a series of problems that he
12 suffers from in a pretty serious way.  And
13 although he has a loving family, including, of
14 course, a loving mother, for some reason this
15 child has bonded with his father.  And he has
16 bonded with his father in a way that makes it
17 crucial to this child that his father be there
18 to take care of him.  And the point here
19 is -- is that this man, Rabbi Rubashkin, knows
20 that.  He knows that if he flees and he leaves
21 his child behind, that while his entire family
22 will suffer -- his wife will suffer, and his
23 children will suffer -- this particular child
24 will suffer to such a degree that I think the
25 Court can conclude, for this reason alone,

35

1  although there are plenty of others, that Rabbi
2  Rubashkin will not flee.  In fact, now he's
3  already started to suffer the consequences of
4  having the father ripped out of the home and
5  gone for a few days.  Ordinarily, the father,
6  even when he's gone, is always in contact with
7  his son.  And the son has realized on some
8  level that something has happened to his
9  father.  Rabbi Rubashkin knows that.  And the
10  doctor's already had to prescribe special
11  medication for his son.  He is already
12  beginning to suffer the consequences of his
13  father being ripped from the home.  So I think
14  that this is one factor that the Court can
15  consider that will keep this man here.  If he
16  is -- if he is released on bail and -- whatever
17  may happen at the end of this case, and we
18  think that there will be an acquittal at the
19  end of this case, but whatever will happen, now
20  he can be there to attend to his son.  And in
21  the unlikely worst event, he can work with his
22  son and prepare him for a transition in a way
23  that he is not able to do now.
24        He would -- and it was a regular part
25  of Rabbi Rubashkin 's life, no matter how much

36

1  attention he had to pay to Agriprocessors, to
2  be sure that he was there for this son, given
3  his son's nature.  And despite that, he has
4  nine other children.
5        I'd like to move now from the ties to
6  the family to the ties to the community.  And
7  not only as Rabbi Rubashkin been in Postville
8  for somewhere between fifteen and twenty years,
9  he is the backbone of the Jewish community
10  there.  When his family acquired the
11  Agriprocessors facility there, it required
12  rabbis who are experienced in ritual slaughter,
13  Rabbis who can supervise the process to make
14  sure that it's done in accordance with Orthodox
15  Jewish kosher requirements.  That required
16  bringing the community of Jews into town to --
17  to live in the community and to integrate into
18  the preexisting Postville community.  It's not
19  a simple matter of creating that community.
20  These people won't come unless they have
21  schools for their children.  And so Rabbi
22  Rubashkin was instrumental in founding the
23  schools for the kids.  There are both the lower
24  school and the high school.  And, indeed, the
25  high school has been so successful that now

37

1  children of families unrelated to the
2  Agriprocessors facility send their children for
3  high school education in this Jewish education
4  high school that was set up there, and again,
5  at the initiative of Rabbi Rubashkin.
6        The -- the closeness of the community
7  is perhaps best illustrated by his home, which
8  I visited.  They recently put on a huge
9  addition to the home to create a room where
10  they can host the community.  This room
11  actually can fit well over a hundred, perhaps
12  closer to 200 people, standing; and it is a
13  place that they host regularly.  Because he is
14  such an integral member of this community,
15  regularly hosting people on social occasions,
16  that his home has become a mecca for the
17  community.  And just the physical structure of
18  the home, I think, reflects his dedication to
19  the community and the community's dedication to
20  him.
21        Further, Your Honor, I think we -- we
22  have further illustrated the dedication of the
23  community into two thick binders, which I would
24  like to offer up, which is Defense Exhibit 5,
25  Volume I and Volume II.

38

1        THE COURT:  Any objection?
2        MR. DEEGAN:  No, Your Honor.
3        THE COURT:  Exhibit 5, consisting of
4  two volumes, is received.
5        (Whereupon, Defendant's Exhibit 5 was
6  received.)
7        MR. WEISS:  And, Your Honor, these
8  are letters that we and the family have been
9  able to collect in just a few days since Friday
10  when -- when Rabbi Rubashkin was arrested and
11  temporarily detained.  Each page represents an
12  expression of support from another individual
13  who has known Rabbi Rubashkin, whether it's
14  from Postville or in his earlier years from
15  other places across the country; many Jews but
16  it includes non-Jews as well.  And these are
17  expressions of support from people who are
18  saying to the Court:  I have known Rabbi
19  Rubashkin for so many years, and I know him
20  well enough that I can assure the Court that
21  this man will not flee.
22        And, of course, I'm not asking the
23  Court to read each one of them right now at the
24  bench, but I would hope -- I would hope that
25  the Court is impressed with the ability, once

**39**

1 word went out that Rabbi Rubashkin was in
2 trouble and that he needed expressions of
3 support from people who could attest to the --
4 his reliability, that he will show up when
5 required.  And these are people who have known
6 him throughout his life.  And I think it's a
7 rare defendant who, even with weeks, would be
8 able to pull together a package like that of
9 letters from people who he's known his entire
10 life.
11         But the community has gone beyond
12 mere letters in their expression of support.
13 And here, I think, is something that is truly
14 astonishing.  I'd like to offer at this point
15 Exhibit 4, Defendant's Exhibit 4.
16         MR. DEEGAN:  No objection, Your
17 Honor.
18         THE COURT:  Exhibit 4 is received.
19         (Whereupon, Defendant's Exhibit 4 was
20 received.)
21         MR. WEISS:  And what Exhibit 4
22 consists of, Your Honor, is a list of
23 families -- I haven't counted them, but just
24 looking at it, I'm estimating there's some
25 thirty there.  These are families who live in

**40**

1 Postville and who have indicated their
2 readiness, who are part of the community, to
3 put up whatever equity they have in their homes
4 to secure Rabbi Rubashkin's release, fully
5 understanding that were he to flee, they would
6 lose their homes.  And these homes -- what we
7 have done, in an effort to give the Court at
8 least some sense of the value of -- that is
9 being -- that we're talking about here, is we
10 created a summary chart on the first page.
11 What follows the first page is a letter from
12 each individual, home-owning family attesting
13 to their readiness to put up their home.  The
14 first page tries to come to some estimate of
15 how much equity we're talking about in those
16 homes.
17         And I have to say, Your Honor --
18 introduce this by saying, given the recent
19 turmoil in the real estate marketplace
20 throughout the country, these are the best
21 guesstimates that we can come up with, but
22 these days, nobody really knows what a house
23 sells for until it sells on that day, and we
24 understand that.
25         But what we did was, in the first

**41**

1 column that says Purchase Price or Assessed
2 Value, whenever there was a recent sale of the
3 home, we would use that.  And if there wasn't,
4 we looked to the assessed value for tax
5 purposes, and we used that as our best guess as
6 to the current market value.  We then took the
7 outstanding mortgage, the balance on whatever
8 mortgage still remains, and simply subtracted
9 that to get the equity earnage of the home.
10 Some of these homes -- as you see, one of them
11 here has no equity, a woman who was anxious to
12 put up her home even when she found out there
13 was no equity.  And I think that's important,
14 because this was the readiness of these people,
15 no matter how little or how much they had in
16 their home, they were ready to stake their most
17 valuable possession on -- on Rabbi Rubashkin,
18 that he will not flee.  And that -- that is
19 a -- an amazing statement of support.
20         And so I think even more important
21 than the value of the equity here or the value
22 of the current market value is the fact that,
23 whatever those figures may be, thirty families
24 in the community that knows him best have
25 staked their homes, and understand that they

**42**

1 can lose their homes, that this man would show
2 up in court when this Court directs him to show
3 up.
4         I'd like to -- I'd like to point out,
5 Your Honor, that -- and I may have said this
6 before, but I think it's worth stressing, that
7 much -- that much of the support that comes is
8 not limited to the Jewish community, and I
9 think that is important.  That is important for
10 the Court to note as well.  So that -- I think
11 that the community is behind him.  And I think
12 the Court can also take judicial notice of the
13 members of the family and the community that
14 are here in the courtroom.  I have to say,
15 there were many more members of the community
16 that wanted to come out today, and I said it
17 was not necessary for the entire community,
18 men, women, and children, to show up to
19 demonstrate their support, but they're here to
20 state their faith in this man.
21         The next issue, with respect to risk
22 of flight, I'd like to address is the Israel
23 issue, if I might, Your Honor.  The Assistant
24 US Attorney has, as part of his presentation,
25 has indicated to the Court that Rabbi Rubashkin

43

1  is a risk of flight because he has traveled to
2  Israel in the past and that he can become a
3  citizen of Israel by virtue of the fact that he
4  is Jewish, and under the Law of Return in
5  Israel, any Jew who decides to move to Israel
6  can gain immediate citizenship.  Let me say
7  first, he is absolutely right with respect to
8  the fact that there is such a law on the books
9  in Israel.  There is no disputing that.  That
10 law permits any Jew who decides to make Israel
11 a home to become a citizen immediately.  But
12 what is important to note is that it entirely
13 irrelevant to the fact that there is an
14 extradition treaty with Israel that would
15 require Israel to return him to the United
16 States were he to flee the United States.
17      This treaty is an old treaty.  It
18 goes back to 1962 and 1963.  It was recently
19 amended, and the amendment -- it was a protocol
20 between the government of Israel and the
21 government of the United States amending the
22 extradition treaty.  It became effective on
23 January 11 of 2007.  And under that treaty, any
24 offense is extraditable if it is punishable
25 under the law of both parties, meaning both the

44

1  United States and Israel -- it's what we call a
2  dual criminality treaty -- as long as it's
3  punishable by more than one -- by a year or
4  more of some sort of penalty.  And fraud,
5  criminal fraud, in Israel is an offense that is
6  punishable by more than one year.  The -- the
7  charge in -- of obstructing justice is a charge
8  that is punishable in Israel by more than one
9  year.  So that -- and the extradition treaty
10 makes clear that it applies whether or not the
11 person is a national of the country or not.
12 So, in other words, Rabbi Rubashkin can go to
13 Israel and become a citizen.  That will have
14 zero impact on the question of whether he is
15 extraditable to the United States or not.
16 These offenses are extraditable.
17      And I can say from my experience,
18 Your Honor -- I was an AUSA for eighteen years.
19 And as part of that time, I was detailed by the
20 Justice Department, because I'm fluent in
21 Hebrew, to work as an emissary to the Justice
22 Department with the Israeli Ministry of
23 Justice.  And part of my job was to watch and
24 learn how the extradition treaty works in both
25 ways, and Israel does extradite people to the

45

1  United States.  It has extradited people to the
2  United States.  These sorts of charges -- with
3  these sorts of charges, he will not find a -- a
4  home in Israel, and he knows that.  I'm --
5  he -- he's hearing me say it right now.  And so
6  the risk of flight to Israel is no greater or
7  less to risk of flight to -- to any other
8  country.  And so by virtue of the existence of
9  the extradition treaty, as amended by the
10 protocol, it is clear that this man has no
11 incentive to flee -- to flee to Israel.
12      Let me -- let me talk then next in
13 terms of risk of flight.  AUSA Deegan also
14 mentioned the trip to Canada.  And I'm glad he
15 mentioned the trip to Canada, because in our
16 view, the trip to Canada demonstrates that he
17 is not a flight risk.  And in order to
18 understand why, I think we have to place that
19 recent trip to Canada in a chronological
20 framework.  The trip to Canada was the end of
21 October, at the time when he was allowed to
22 travel to Canada.  He had not been arrested.
23 His first arrest was, as the Court noted
24 earlier, October 30.  Prior to that arrest, he
25 traveled to Canada and came back.  That's the

46

1  significant part.  He voluntarily left and he
2  voluntarily came back.  Why -- why does that
3  demonstrate that he's not a risk of flight?
4  Well, at that time, it was crystal clear to
5  Rabbi Rubashkin that the noose was tightening.
6  In May, they searched Agriprocessors.  After
7  they searched Agriprocessors, he started
8  getting target letters.  And in that respect,
9  let me ask the Court to look -- well, let me
10 offer, if I might, Defendant's Exhibit 3.
11      THE COURT:  Any objection?
12      MR. DEEGAN:  No, Your Honor.
13      THE COURT:  3 is received.
14      (Whereupon, Defendant's Exhibit 3 was
15 received.)
16      MR. WEISS:  And what 3 consists of is
17 a series of letters that inform both the
18 company, Agriprocessors, and very importantly,
19 Sholom Rubashkin, himself, that he/they are
20 targets of a series of very serious criminal
21 investigations.  For example, the search -- the
22 first search was May 12.  On May 20, the
23 company gets a target letter.  On May 20, Rabbi
24 Rubashkin gets an immigration target letter
25 that lists the immigration charges.  On May 21,

47

1  he gets a bank fraud/money laundering/witness
2  tampering letter indicating that he's a target.
3  And then, if you look -- the last letter, dated
4  September 19, it's a discovery letter, where
5  Mr. Deegan was kind enough to afford the
6  defense some early discovery, which we
7  appreciate.  But what's important is at the end
8  of the letter, the last major paragraph in the
9  letter, he reiterates that Sholom Rubashkin is
10  under investigation, and he says it's -- the
11  investigation is continuing with respect to
12  harboring, with respect to money laundering,
13  with respect to fraudulent document expenses,
14  with respect to RICO, with respect to bank
15  fraud.  The list -- the list of charges there
16  that is being contemplated is astonishing, and
17  yet -- and AUSA Deegan was making it clear
18  through counsel that Sholom Rubashkin was going
19  to be charged.  And knowing all that, when he
20  had his passport, he left the country, and he
21  came back.  And the reason he -- he came back
22  was for the very reasons that I've been
23  articulating to the Court:  That he was not
24  prepared to leave his family; he was not
25  prepared to leave his wife; he was not prepared

48

1  to leave his fifteen-year-old disabled son; and
2  he was not prepared to betray the community
3  that he had worked so hard -- he had worked so
4  hard to build.  And yet, in addition to that,
5  he got arrested on October 30, was released on
6  bail, he didn't flee.
7          On November 4, after he was released
8  on bail, they executed another search warrant
9  at Agriprocessors.  This search warrant was
10  clearly for the bank fraud investigation.  And
11  he was, therefore, on notice that the
12  tightening noose was about as tight as it could
13  get, and he still didn't flee.  They found him
14  and arrested him on November 14 when they went
15  to look for him.  I don't think there can be
16  any -- any measure of -- any better measure of
17  whether the man is a risk of flight than he
18  doesn't flee when he knows he's being
19  investigated, he doesn't flee after he's
20  already been charged and released, he doesn't
21  flee every time the government advertises to
22  him, clearly and boldly, that he is going to
23  get arrested on more and more serious charges.
24          I'd like to address, on the -- also
25  on the risk of flight issue, the cash in the

49

1  home, which -- and the photographs with respect
2  to the cash.  First of all, I'd like to point
3  out, in AUSA Deegan's presentation, he directed
4  the Court's attention to much of the cash that
5  was found in a box.  And he indicated, and I'm
6  glad he indicated, those were all singles,
7  single dollar bills.  And what I'd like to
8  proffer to the Court is that that money -- one
9  doesn't flee with a stack of singles that is
10  that high.  What that suggests, in fact, is
11  that that was the equivalent of a charity
12  plate.  This was charity money that had been
13  contributed over time that he had collected and
14  brought into his home for ultimate transmission
15  to the charitable source.  He is a member of
16  the Lubavitch or Chabad group of Jews, and this
17  was money collected for their charity.  These
18  are dollar bills that people put in little
19  collection boxes, the equivalent of a
20  collection plate, in synagogues and other
21  places.  And with respect to that chunk of
22  money, I think that it's simply not fair to say
23  that that was money that was being collected
24  for flight, and, of course, the fact that it
25  was singles suggests otherwise.

50

1          With respect to the other sums, Your
2  Honor, I think it's helpful to note that it was
3  all in the tote bag with all their valuables,
4  with respect to their birth certificates, cash,
5  passports.  They kept all their valuables in
6  one place.  They had to keep it in one place,
7  as they generally do with valuables, but also
8  because, as you have seen with the doctor's
9  letter with respect to their fifteen-year-old
10  son, valuables had to be kept in a safe place
11  so he wouldn't destroy or throw that stuff
12  around.
13          The reason there was so much cash, we
14  would proffer, is the -- the defendant was
15  suffering from tightening financial problems.
16  Because of the raid that the government had
17  initiated -- the raids the government
18  initiated, the financial situation of the
19  company and the family was deteriorating
20  rapidly.  And there was a need to engage in --
21  a need to save up some cash so that they could
22  meet their bills.  They're a family of ten.
23  Most of the kids are toddler age and up, still
24  living at home.  So there was a need for a
25  substantial amount of cash to carry the family

51

1  through a period when their checks were
2  bouncing, their accounts were in trouble.
3          May I have one moment to speak to
4  AUSA Deegan, if I might.
5          THE COURT:  Sure.
6          (Counsel conferred.)
7          MR. WEISS:  I have a new exhibit I'd
8  like to offer up, Your Honor.  And I took a
9  minute to show it to AUSA Deegan because I had
10  not shown it to him prior to the hearing.
11         MR. BROWN:  May I approach for a new
12  sticker, Your Honor.
13         THE COURT:  You may.
14         MR. BROWN:  Thank you, sir.
15         MR. WEISS:  And I don't have copies
16  of this, but if I could hand this up to the
17  Court -- may I approach, Your Honor.
18         THE COURT:  The clerk will get it.
19         MR. WEISS:  What that represents,
20  Your Honor, is an instance where they had to
21  pay -- the family had to pay a recent
22  substantial bill in cash, because of some of
23  the cash flow problems that they're suffering
24  at the bank.  That's over a $1,700 bill.  I'm
25  sorry, I don't have it in front of me, so I

52

1  don't remember the exact figure for the record,
2  but it was something in excess of $1,700 that
3  was paid to the Ford Motor Company by way of a
4  cash mailgram, I think it is.  And again,
5  I'm --
6          THE COURT:  MoneyGram.
7          MR. WEISS:  MoneyGram, I'm sorry.
8  And I'm -- I'm offering that as -- as an
9  example of the sorts of bills that the family
10  is now resorting to cash to pay.
11         THE COURT:  Any objection to receipt
12  of Exhibit 6?
13         MR. DEEGAN:  No, Your Honor.
14         THE COURT:  6 is received.
15         (Whereupon, Defendant's Exhibit 6 was
16  received.)
17         MR. WEISS:  Finally, Your Honor, with
18  respect to -- with respect to the risk of
19  flight, there are a few additional things I'd
20  like to offer to the Court that I think would
21  help.  One is the family brought four of the
22  passports that they had that were the passports
23  of the children, including -- including Moishe,
24  the child we've been talking about until now.
25  And the family is ready to deposit these

53

1  passports with the Court as further indication
2  that Rabbi Rubashkin and his family won't flee.
3  He will not go anywhere without his family, and
4  so having these passports make it more
5  difficult for the family to flee, even if they
6  were to contemplate such a thing, which they
7  have not; would further ensure the Court that
8  he would stay.
9          And for the record, the passports
10  that we're offering up would be for Moishe
11  Rubashkin.  That's the first one.  The second
12  one would be for Devota Menuha Rubashkin.  The
13  third one would be for Uziel, U-Z-I-E-L,
14  Rubashkin.  And then the last one would be for
15  Menachem Mendel Rubashkin.
16         In addition, Your Honor -- in
17  addition to the approximately $2 million valued
18  in equity in the homes of the families in
19  Postville, the family has also been successful
20  in getting commitments from a number of other
21  individuals that would enable the Court to
22  significantly increase the bail package.  If
23  the Court remembers, the current bail package
24  with respect to the immigration release, if I
25  understand correctly, was a million dollars

54

1  secured by 500,000.  And right now, the Court
2  has almost $2 million in real property, homes
3  in Postville.  But in addition, there are
4  substantial additional monies we could put up.
5  And if and when the Court gives me a break, I
6  can get the latest figure that we have firm
7  commitments on from the defendant's wife.
8  Because of the shortness of time between Friday
9  and today, this has been ongoing, sort of a
10  late-breaking thing.  But I can represent to
11  the Court that we have commitments for
12  substantial additional funds.  And at the
13  break, I'll get the latest -- if the Court will
14  give me later on, or whenever, a break, I'll
15  get the latest figures that we would be
16  prepared to add to the preexisting bail to
17  create a very substantial bail package.  I
18  think that with the homes in Postville, with
19  the 500,000 that's preexisting, and with the
20  additional money, it's going to be at least $3
21  million securing his release.  That is a very
22  substantial bail package, Your Honor.  And it's
23  a rare white-collar defendant who can't be
24  relied on to appear when there is a package of
25  that magnitude.

55

1    I would submit the Court doesn't need
2 it, but I wanted to tell the Court what we have
3 and we're ready to put up.  And so that, Your
4 Honor, is with respect to the risk of flight.
5 And I'd like to take a moment and turn to the
6 tampering.
7    May I have one moment to consult with
8 Mr. Brown.
9    THE COURT:  Sure.
10    (Counsel conferred.)
11    MR. WEISS:  Thank you, Your Honor.
12 The next -- the next issue then is whether the
13 government has met its very heavy burden by
14 proving by clear and convincing evidence that
15 the defendant is a serious -- and that again is
16 the word that 3142 uses -- presents a serious
17 risk of tampering in the future.  And whatever
18 he may have done in the past, the inquiry is
19 not whether he tampered or not in the past.
20 That, we have to leave for another day when
21 there is a trial in this case.  The question
22 is, even if you accept what he is suggesting,
23 is he -- is this defendant a risk of tampering
24 with evidence in any way or obstructing in the
25 future if he were to be released.

56

1    And in that respect, I'd like to
2 begin, if I might, with the affirmation -- or
3 an affidavit -- affirmation, I'm sorry, which
4 is Defendant's Exhibit 1.  And I'd like to
5 offer that.
6    THE COURT:  Any objection?
7    MR. DEEGAN:  No, Your Honor.
8    THE COURT:  Exhibit 1 is received.
9    (Whereupon, Defendant's Exhibit 1 was
10 received.)
11    MR. WEISS:  What 1 indicates is
12 that -- this is an affirmation from a
13 Mr. Feldman, a Bernard Feldman, who is an
14 attorney and a member of the New York Bar in
15 good standing for thirty-eight years.  He
16 served for five years as corporate counsel to
17 Agriprocessors.  And after Agriprocessors began
18 to experience the latest round of difficulties,
19 because of this investigation, they -- they
20 brought in Bernard Feldman to serve as the CEO.
21 And what he relates here in the affirmation is
22 that there's a series of changed circumstances,
23 most of which has taken place, some of which is
24 about to take place, that essentially ensures
25 that Sholom Rubashkin is going to be devoid of

57

1 any possibility whatsoever.  He will -- it
2 would just simply be impossible for him to
3 obstruct or tamper any evidence at the place.
4 And what does he state there that indicates
5 that?  Well, the first thing is that there is
6 -- Agriprocessors is now in Chapter 11, and the
7 bankruptcy court has now issued an order that
8 there needs to be a trustee appointed.  This is
9 separate and apart from the receiver that AUSA,
10 as far as I understand it, that AUSA Deegan was
11 talking about with respect to the bank, which
12 is supposedly a victim of this bank fraud, and
13 was looking for the appointment of a receiver
14 to help it recover its funds.  This -- this
15 trustee -- the Court has already ordered the
16 appointment of a trustee.  And the trustee,
17 from what I know and understood, he is supposed
18 to have already been or today will be
19 appointed.  So that you now have a CEO from
20 outside the Rubashkin family, a respected
21 member of the Bar, coupled with a trustee who
22 is about to be put in place or who is already
23 in place, who is going to be running the
24 company.
25    In addition, the company is for sale

58

1 and is very close to finalizing a sale of the
2 company.  If you look in Paragraph 5,
3 Mr. Feldman states, "Currently, negotiations
4 are ongoing with a number of potential
5 purchasers/investors for sale of the company
6 and for sale of the assets.  I expect that such
7 negotiations will be fruitful," apparently left
8 out the word "and completed," "in the very near
9 future."  Indeed, I can represent to the Court
10 that when I was there recently visiting, I saw
11 potential purchasers there negotiating for the
12 purchase of the Agriprocessors.
13    And in addition, what Mr. Feldman
14 indicates is that there are very tight security
15 measures there at the facility.  And if the
16 Court directs, what he will do is as follows:
17 The first thing is electronically program the
18 electronic security system there to make sure
19 that Sholom Rubashkin cannot get in.  He will
20 not be able to get in through these tall, heavy
21 wrought metal, swinging, iron gates that are
22 under supervision -- security supervision at
23 all times.
24    In addition, we would suggest to the
25 Court that the Court, as part of its conditions

59

1  of release, issue an order that precludes Rabbi
2  Rubashkin from contacting any Agriprocessor
3  employee or Agriprocessor business in any
4  shape, manner, or form.  And Mr. Feldman has
5  indicated that he will ensure that this order
6  is distributed to all the relevant employees at
7  the company, so that the employees of the
8  company who are there know that if
9  Mr. Rubashkin were to pick up the phone and
10  call them, that he is violating a court order
11  and they would presumably, therefore, not
12  entertain the call.  So that if -- if the --
13  very soon the company is going to be out of
14  Rubashkin hands and will be sold at arm's
15  length to some outside purchaser.  If there is
16  an order -- if there is an order issued that is
17  distributed to the members of the
18  Agriprocessors, and, in addition, if -- if --
19  if -- if -- if the electronic security is
20  reconfigured to bar his entry, his ability in
21  the future to tamper with the evidence is going
22  to be virtually nil.
23       The other thing we would suggest in
24  this respect, Your Honor, is that when -- if
25  and when you do release him, as, of course, we

60

1  hope you do, that until the sale is consummated
2  -- and the sale will be consummated because the
3  company must be sold -- that we would suggest
4  releasing him on the most onerous restrictions
5  possible, until the sale is completed.  And I
6  have two possibilities in that respect that I
7  would offer to the Court.  One, of course,
8  would be home detention, and he would be
9  detained in his home, forbidden -- of course,
10  continuing with the bracelet, now with
11  geographical limitations, not what they were
12  before but to his home, until such time,
13  hopefully in the next few days, certainly in a
14  week or in the next week or so, based on what I
15  have learned so far.  That he not be permitted
16  to leave his home, that would be our first
17  choice.  Alternatively, we have a number of
18  families who are geographically distant from
19  Postville.  If the Court thinks that it is
20  necessary until the closing of the deal takes
21  place, if it's necessary, that Rabbi Rubashkin
22  be geographically distant from the factory, we
23  have a number of families who have indicated a
24  readiness or a willingness to take him -- take
25  him in.  That includes family members in

61

1  New York, his son in Florida, he has a
2  brother-in-law in Los Angeles, and I
3  believe -- if I may have just one moment, while
4  I consult with his wife on this issue.
5       THE COURT:  You may.
6       (A discussion was held off the
7  record.)
8       MR. WEISS:  And in addition, there is
9  a Rabbi Jacobson in Des Moines, Iowa, who is a
10  close friend of the family.  If the Court feels
11  that it's necessary to keep him within Iowa but
12  distant from Postville, we have a family in
13  Des Moines that would be prepared to take him
14  until such time as the deal is complete so that
15  there is absolutely no risk of his getting
16  close to the plant and -- until the deal is
17  completed and it changes hands out of the
18  Rubashkin family.
19       May I have a moment, Your Honor.
20       THE COURT:  You may.
21       MR. WEISS:  So with respect then to
22  the danger to the community, the tampering, and
23  the risk of flight, we believe that by
24  increasing the package, by subjecting him to
25  geographical -- severe geographical limitations

62

1  until the sale is complete, coupled with a
2  court order and the other measures that
3  Mr. Feldman talks about in his affidavit, I
4  think we have addressed the concerns of the
5  government and addressed the only two issues
6  that are really here for today, and that is, if
7  he's released, has the government proven that
8  he's a risk of flight: if he is released, has
9  the government demonstrated by clear and
10  convincing evidence that there is a serious
11  risk of future tampering.
12       That was my part of the presentation.
13  If the Court now allows, Mr. Brown wants to
14  address something else that Mr. Deegan
15  presented.
16       THE COURT:  Mr. Brown.
17       MR. BROWN:  I'll be brief, Your
18  Honor.  Thank you.  As I understand the Bail
19  Reform Act, in the absence of presumptive
20  detention, the language instructing the Court
21  is "shall release the defendant unless the
22  government can prove," and in the case of risk
23  of flight, by a preponderance, "that there are
24  no conditions that would ensure his
25  appearance," and on the issue of future

**63**

1  dangerousness, that there are no conditions
2  that would provide safety to the community.
3  That's my understanding of what -- the legal
4  framework.  And I just wanted to add a couple
5  pieces.  As I read -- as I read the complaint,
6  relating to the First Bank accusations,
7  specifically, Paragraph 13 and 14, essentially
8  detailing what the cooperating individual says
9  was occurring, and then you look at that in
10  conjunction with the government's first four
11  exhibits, the checking account records,
12  particularly the checks coming from entities
13  back into Agriprocessors, what are we seeing
14  here post May 12, 2008?  It appears, if you're
15  looking at the nature of the alleged offense,
16  under 3142(g)(3), that -- what appears to be
17  happening here is that somebody is borrowing
18  accounts receivable monies, and then that money
19  is getting paid back.  And it's going back into
20  Agriprocessors, and it's going back into the
21  sweep account at a later time.  This is --
22  what's unusual about the bank fraud allegations
23  in this case is that there's nothing in the
24  complaint that directly lays out that, or even
25  infers, that Sholom Rubashkin has somehow

**64**

1  diverted for his own personal use substantial
2  portions of money.  And as counsel, Mr. Weiss,
3  has indicated -- and I want to just add a
4  little bit to this -- entities such as the
5  Torah Education Program, whether incorporated
6  under a different individual's name or so
7  forth, are Agriprocessors.  They -- in order
8  for Agriprocessors to work, prior to the
9  eventual sale, they had to have these programs.
10  And if -- and Agriprocessors had a right,
11  subject to their loan agreement with First
12  Bank, to give as much money as they wanted to
13  TEP, as they could, and to the grocery store
14  that helped -- fed its citizens.  And so in and
15  of itself, those -- the fact that
16  Agriprocessors is putting money into entities
17  that may seem unusual or different, that was
18  necessary to preserve the community.  So with
19  relation to the nature and characteristics of
20  the offense, I think we have kind of an odd-lot
21  case.  This doesn't fit the mold of the
22  traditional bank case where the CFO or the
23  high-level executive of the company is
24  siphoning off checks and they're going directly
25  to his own benefit.

**65**

1       One last thing that I wanted to talk
2  on, on the risk of flight prong.  As I read
3  3142(g), nowhere do I find ethnicity or
4  religious issues a factor to determine whether
5  or not somebody is to be kept in jail or not.
6  And frankly, it seems to me that the fact that
7  he's -- that Israel exists out there is -- is
8  no more than a red herring.  The government,
9  from their proffer, from pictures of the
10  keepsake bag in the closet, has not raised more
11  than mere speculation that Israel is of
12  interest to Sholom Rubashkin.  And, in fact,
13  just the opposite is established by the record
14  in this case.  You know, following May 12, what
15  do we know?  A search warrant affidavit was,
16  you know, kept open -- or unsealed, and it
17  clearly details that this gentleman is a target
18  of future criminal prosecution.  We're
19  presented the target letters.
20       And what else do we know?  Sometime
21  in September, the governor of this state, in an
22  op-ed piece in the Des Moines Register,
23  essentially told the Attorney General, "I want
24  this man charged."  And the Attorney General's
25  response in September was 9,311 counts of

**66**

1  simple misdemeanors nonetheless.  But if you
2  total all that up, that's 765 years.  And did
3  Sholom Rubashkin flee to Israel?  No.  How did
4  the district court respond to that charge?
5  Released on his own recognizance.
6       Now, I assume the State [sic] may
7  suggest:  Well, they'd have had a hard time
8  keeping him in jail or putting the bond so
9  high; and 765 years isn't very realistic;
10  they're only simple misdemeanors.  I don't
11  think the Attorney General thinks it's all fun
12  and games.  And even adding one day for every
13  9,311 counts, you're looking at serious time,
14  and Mr. Rubashkin did not flee.  And that
15  occurred all before he was charged by the
16  initial complaint in this particular case.
17       I want to proffer a specific point
18  relative to the week of October 23 through the
19  31st of '08.  I would proffer, if called to
20  testify, Chiam Abrahams -- spelled C-H-I-A-M --
21  would testify that First Bank officials arrived
22  unexpectedly to his knowledge and Sholom's
23  knowledge on October 23.  They were expected
24  the following Monday, but they came early.  So
25  they got two days of, arguably, fettered or

**67**

1  unfettered access to data.  The documentation
2  the government's presented is that sometime
3  after they arrived, Sholom Rubashkin then left
4  to visit Canada.  And he proffers that he went
5  to visit a gentleman by the name of
6  Mr. Shochet -- S-H-O-C-H-E-T -- to try to
7  enlist him to fund and become an investor in
8  Agriprocessors to save this failing company.
9          So during his absence, Mr. Abrahams
10  would testify, that F. Bank -- or First Bank
11  officials had access to data and information at
12  the processing plant.  On October 30 we know
13  that Mr. Rubashkin was arrested.  And what I
14  want to further proffer through Mr. Abrahams is
15  on October 31, 2008, they already knew because
16  First Bank had sued them, and First Bank was
17  receiving a receivership, and then a hearing
18  was going to be held shortly after the 30th in
19  front of the Honorable Judge Reade to try to
20  obtain that temporary receivership, that some
21  third-party was coming in to take access and
22  control of the company.  And on that day they
23  were having conversations -- "they" meaning
24  Mr. Rubashkin and Mr. Abrahams, and Tovi
25  Bensasson, the controller.  They were speaking

**68**

1  with Bernie Feldman, and people were rushing in
2  and out of the office/room on the second floor
3  in the main area of Agriprocessors.  And there
4  was, he would testify, general discussion
5  about -- without using the expressed words, he
6  does not recall the expressed words -- "clean
7  up your desk," but there was more than minimal
8  discussion with employees about:  What we
9  should do about our personal property, because
10  the receiver will be coming in and how will --
11  how will we be able to get that back.  And so I
12  offer that proffer as -- as some kind of
13  counter to the information contained in the
14  complaint that we perceive is somewhat
15  ambiguous about what the phrase "clean up your
16  desk" or "clean out your things" means.
17          I would further proffer, or suggest,
18  that the key to analyzing whether or not this
19  "clean up your desk" comment, if it was made,
20  has any evidentiary significance and
21  constitutes some form of obstructive or --
22  substructive -- or destructive effort, the
23  government's presented no evidence that any of
24  the computer data or the books at
25  Agriprocessors that were in existence between

**69**

1  10-31 and 11-5 is not accurate.  Right?
2          MR. DEEGAN:  I'm sorry, counsel,
3  you're going to have to repeat what you just
4  said.
5          (Counsel conferred.)
6          MR. BROWN:  So if we are to place any
7  more than minimal significance on the supposed
8  use of a code word, if it is a code word,
9  "clean out your desk," and if that is supposed
10  to be some destructive instruction, we would
11  have to know whether or not that had some
12  overall effect on the data that ultimately
13  First Bank got its hands on, and there's just
14  no showing in this particular instance.  So I
15  respectfully submit that the ambiguity of the
16  significance or lack thereof of this code word
17  as a destructive element or an attempt does not
18  raise to the level of clear and convincing
19  evidence, Your Honor.
20          THE COURT:  Mr. Weiss.
21          MR. WEISS:  Yes, I was going to get
22  back to you with some figures, Your Honor.  And
23  in terms of cash that friends or family are
24  prepared to put up, we have $225,000 additional
25  in cash.  In terms of equity in homes, in

**70**

1  addition to that list of Postville homes, we
2  have one relative, a nephew of Rabbi Rubashkin
3  who lives in New York, has a million dollars of
4  equity in his home, and he's ready to put it
5  up.  In addition, his in-laws, who also reside
6  in New York, are prepared to put up the equity
7  in their home, which may be as much as
8  $600,000, certainly between 500 and $600,000.
9  And all of this is in addition to the
10  preexisting $500,000.
11          THE COURT:  Is that it?
12          MR. WEISS:  Yes.
13          THE COURT:  Any objection to the
14  defendant's proffer, Mr. Deegan?
15          MR. DEEGAN:  No, Your Honor.
16          THE COURT:  Do you wish to be heard
17  by way of argument, Mr. Deegan?
18          MR. DEEGAN:  I do, Your Honor.
19          THE COURT:  You may proceed.
20          MR. DEEGAN:  First of all, I want to
21  talk about the standards, legal standards.
22  Both counsel seem to be imposing the serious
23  risk that the defendant will obstruct or
24  attempt to obstruct justice onto the safety of
25  the community.  The statute says the government

71

1  has to prove that someone may pose a threat to
2  the safety of any other person in the community
3  by clear and convincing evidence.  It doesn't
4  say that it has to show that a serious risk
5  that a person will obstruct or attempt -- will
6  obstruct or attempt to obstruct justice has to
7  be shown by that.  Quite frankly, I haven't
8  looked at the answer to that, but I know the
9  risk of flight is, as counsel acknowledges, by
10  the preponderance of the evidence, and that is
11  -- that risk that the person will attempt to
12  obstruct justice is subpart (b) of the same
13  section.  So I don't know that that's supported
14  by the law, that there's any clear and
15  convincing evidence standard with regard to
16  these issues here.
17            THE COURT:  If I can try to
18  straighten that out, or at least give you my
19  understanding as to what I think it's supposed
20  to be.  Under the Bail Reform Act, which is
21  Title 18 Section 3142, in order to have a
22  detention hearing, one of seven situations has
23  to exist.  There are five offense types that
24  would generate a hearing.  None of those apply
25  here.  And then there are two risk types that

72

1  generate a hearing.  One is risk of flight, and
2  the other one is the tampering or obstructing
3  justice.  My understanding is that, if either
4  of those two alternatives exist, that's what
5  generates the hearing.  And then once you get
6  to the hearing, you go to a different Code
7  section that talks about the government bearing
8  the burden of proving either risk of flight or
9  danger to the community.
10            My understanding is that -- that risk
11  of flight has to be proven -- well, strike
12  that.  And again, to be safe, I should pull it
13  out and actually read it, but to paraphrase it,
14  it's my understanding that the government has
15  the burden of showing that there is no
16  condition or combination of conditions which
17  will reasonably assure the defendant's
18  appearance as required and the safety of the
19  community.  The requirement that that be shown,
20  with respect to appearance, has to be proven by
21  a preponderance of the evidence.  That showing,
22  that there is no condition or combination of
23  conditions which would assure the safety of the
24  community, has to be shown by clear and
25  convincing evidence.  Safety of the community,

73

1  incidentally, is more than physical violence.
2  It can refer to economic crimes as well.  I
3  mean, again, that's a paraphrase of what the
4  Code says and, obviously, I would refer
5  specifically to the Code sections.  So there --
6  I think there was some confluence there of the
7  arguments.  In order to get to the hearing at
8  all, I think you're referring to the two risk
9  factors.  But then once you get to the hearing,
10  then the conditions or combination of
11  conditions has to be proved by those two
12  different standards of proof.
13            Mr. Deegan.
14            MR. DEEGAN:  Thank you.  By way of
15  argument, then, we have -- we have shown the
16  defendant's violated his conditions of pretrial
17  release.  And that's important, because a
18  defendant who doesn't comply with terms of
19  release is more likely to violate the
20  conditions of -- that any court would put on
21  him in the future.  He was asked -- he asked an
22  employee to delete evidence of bank fraud the
23  day after his release.  Mr. Brown indicates,
24  well, we haven't put on any computer evidence.
25  We put on evidence by way of proffer and the

74

1  complaint affidavit, that whatever is on the
2  computer isn't there anymore precisely because
3  this defendant was out.
4            In addition, we've got two different
5  employees saying that there was a request by
6  the defendant to clean their desks.  And
7  certainly, with regard to the one referenced in
8  the criminal complaint, this person took this
9  as an understanding that she was supposed to
10  get rid of evidence.  As regard to the second
11  person that mentioned me, I think it's the
12  proper inference that that was what the "clean
13  your desk" comment was intended to address, and
14  this person understood it as addressing that,
15  because she got rid of a working document that
16  normally she wouldn't shred until -- I mean,
17  this wasn't personal property.  This was an
18  Excel spreadsheet with a bunch of check
19  information on it.  In any event, because of
20  the defendant being out, more evidence was lost
21  regarding the bank fraud.
22            Also, you've got the prior evidence
23  in this case by way of the situation involving
24  Teresa Downing and the defendant attempting to
25  influence a witness in a bank fraud.

75

1    Now, as far as risk of flight goes,
2  you've got a bag in the defendant's closet.
3  It's got passports, thousands of dollars in
4  cash, some of which is in a travel bag, one
5  that would be put on your person.  You've got
6  original birth certificates, for both the
7  defendant and his wife, and original social
8  security cards.  Your Honor, if you were going
9  to leave in a hurry, this is exactly what you
10  would pack in a bag and get ready to go.  There
11  is an acute risk of flight in this case.
12    There's also, it's worth noting, two
13  empty lockboxes in that closet with nothing in
14  them.  Those are the types of places where you
15  keep passports, travel documents, large amounts
16  of cash, social security cards.  They're empty:
17  it's been put in a bag.
18    Regarding the ease with which the
19  defendant could gain admission to Israel, it
20  doesn't seem there's any dispute about that
21  fact.  Counsel indicates that there is an
22  extradition process, however, I don't believe
23  that that is something the Court ought to
24  consider when the question is whether or not
25  there's a serious risk that the person will

76

1  show up for a hearing or not, not whether or
2  not we can get him back through an extradition
3  process.  It could take years.  There's, of
4  course, all sorts of reasons that that's a
5  completely unacceptable alternative to having
6  the defendant show up as ordered.
7    Regarding the target letters and
8  informing the defendant about the bank fraud
9  investigation and other investigation, again, I
10  think it's -- the reasonable inference is these
11  were referring to the previous bank fraud case
12  involving Teresa Downing.  Now, in this case,
13  despite all those letters, and despite knowing
14  that he's under investigation for serious
15  crimes -- and there's no question that he was
16  put on notice -- he's committing new bank
17  frauds in late October of 2008.  Consider also
18  that in the weekend prior to the immigration
19  raid, as agents are getting ready in Waterloo
20  for what many people speculated was some sort
21  of work site enforcement action, that the
22  defendant is working with other people to get
23  new identification, fake identification
24  documents, for a huge portion of his -- or not
25  a huge percentage but a huge number, of his

77

1  workforce.  So the fact that the defendant knew
2  this stuff was coming, I think, is important
3  for the Court to consider, only because he
4  continues to commit crimes, and the types of
5  crimes that cover up and hide and obstruct
6  justice.
7    In addition, the -- the old bank
8  fraud with Teresa Downing involved -- it was a
9  significant number.  It was -- it was a lot of
10  money.  This is a $35 million line of credit
11  that went belly up.  And Mr. Brown indicates,
12  well, you know, he's just borrowing money from
13  one place and putting it in another place, or
14  somebody is, as Mr. Brown indicated.  Well, the
15  government's evidence shows who did it.  And
16  the case is strong.  And these types of lending
17  relationships, Your Honor, are built on trust.
18  The bank continues to lend money to a company
19  and to individuals who are, you know, in very
20  severe financial trouble because they can trust
21  the representations that they're making to
22  them.  That's why, when Phil Lykens found out
23  that there were accounts -- payments on
24  accounts receivable, the bank's money, the
25  bank's collateral, being diverted one way or

78

1  the other into accounts they weren't supposed
2  to be in, that he got in the car and he went up
3  to Postville, and he tried to figure out what
4  happened.  And within a matter of days, the
5  line of credit is pulled, and there's a
6  bankruptcy.
7    Your Honor, I'd like the Court to
8  look at those checks, the checks that the
9  accounts receivable clerk says she was directed
10  to create at the direction of the defendant.
11  They're in odd amounts that can't be reconciled
12  with these prior payments.  Okay.  And they are
13  from Agri -- A-G-R-I -- to Agriprocessors.  And
14  they're not signed by anybody.  They've got an
15  electronic authorization on them.  Okay.  And
16  when Lykens is up there and they're trying to
17  sort all this out, he can't get anybody to
18  answer the question of who authorized these
19  checks.  These are all indicia of an intent to
20  defraud, guilty knowledge on behalf of the
21  defendant.  And again, Your Honor, this is
22  happening at the very end of October, in the
23  last weeks of October, at a time when the
24  defendant knows that he's got serious criminal
25  legal problems mounting against him.

79

1        Your Honor, this fraud under the
2    guidelines will be evaluated, in the event of a
3    conviction, according to the actual loss
4    resulting from the offense.  This company, at
5    least in October, and, you know, if you
6    consider the Kosher Grocery and Torah Education
7    money that's going in and out -- and Mr. Brown
8    indicates, well, they have every right to put
9    money into those businesses.  Look at -- look
10   at the totals on the checks.  They're not
11   putting money into those businesses.  Those
12   businesses don't have any reason to be getting
13   millions of dollars of Agri's money.  They're
14   putting money through those businesses.  And
15   Sholom Rubashkin is doing it, and he's doing it
16   so that it makes it look like, when the money
17   goes to the depository account, they're coming
18   from a payment on an account receivable.  But
19   that tells you how long this has been going on.
20       So, yes, this is a huge fraud.
21   It's -- it's going to be measured, if it gets
22   to sentencing, by how much the actual loss is.
23   And at this point, the company is bankrupt, and
24   there is going to be millions and millions of
25   dollars in loss.  Anything over, I think it's

80

1    22,000 -- or excuse me, 20,000, is going to
2    result in a 22-level enhancement, 22 levels,
3    under the fraud guideline.  We're talking years
4    and years in prison.  If we look at the checks,
5    in the Kosher Grocery list and the Torah
6    Education list, you're going to see that it
7    makes sense that that's what these -- that's
8    the checks that the accounts receivable clerk
9    was referring to.  There are groups of
10   sequential checks, you know, number, for
11   instance, 4, 5, and 6, and then a few others,
12   and then 10, 11, 12, 13, indicating exactly as
13   this person said, large amounts of money cut up
14   into seemingly random amounts and then all
15   submitted on the same day.  Again, all with
16   intent to defraud, to hide what was going on,
17   the diversion of the bank's money, the bank's
18   collateral.
19       And, Your Honor, it's perhaps kind of
20   an obvious point at this point, but it bears
21   emphasis, that at the time the defendant was
22   released, at a time previously in the other
23   case where the government agreed to release,
24   there was a business operating in Postville
25   called Agriprocessors, and now, by all

81

1    indications, there is not an ongoing business
2    concern.  That severely impacts the defendant's
3    ties to the community.  It doesn't provide the
4    same support for his family that it used to.
5    He doesn't have the same interest in, perhaps,
6    you know, continuing to work at the company and
7    try to turn the company around.  They've got a
8    new CEO now.  It simply doesn't provide
9    anywhere near the type of community that
10   perhaps it did at the time that the defendant
11   was released in the other case.
12       Finally, just a couple more comments
13   in response to what Mr. Brown said.  He
14   indicated, well, the government hasn't located
15   any computer data that would support the fraud
16   that was going on.  Well, the CFO of the
17   company acknowledged to Lykens during that
18   meeting that -- that Agri had been borrowing on
19   accounts receivable that had already been paid,
20   so you've got the CFO acknowledging what had
21   happened here.  And in order for that to be the
22   case, the -- the customer payments must have
23   been diverted and the submissions to the bank
24   must have been overvalued in the sense that
25   those customer payments did not appear to have

82

1    paid down those customer accounts.  So again,
2    the CFO is acknowledging this once they're
3    caught, that this is what was happening.  And
4    if you look at the Torah Education checks and
5    the Kosher Grocery checks, this has been going
6    on for an awfully long time.
7        Again, Your Honor, just getting back
8    to the risk of flight, this isn't a
9    circumstance where there's any conditions, no
10   matter how much of other people's money they're
11   willing to put up, to keep -- to support
12   defendant's bond.  The risk of flight here is
13   acute.  It's too great.  It appears as though
14   defendant was arrested just before it was too
15   late.
16       THE COURT:  Is there anything --
17       MR. DEEGAN:  Excuse me, Your Honor, I
18   have to mention one more thing.  Counsel's
19   proffered that a trip to Canada was in order to
20   try to get some sort of funding for
21   Agriprocessors, if I'm understanding the
22   proffer correctly.  That's not what the
23   defendant told Border Patrol.  Look at --
24   Customs in Toronto, look at Government's
25   Exhibit 27.  He said there was no business

83

1   conducted during that trip.  Thank you.
2        THE COURT:  Is there any case that
3   you wanted to cite, Mr. Deegan?
4        MR. DEEGAN:  No, Your Honor.
5        THE COURT:  Does defendant wish to be
6   heard by way of argument?
7        MR. WEISS:  Just on a few small
8   points, Your Honor, because most of the
9   argument we presented in our original
10  presentation.  I want to briefly address, in
11  terms of the risk of flight, the seriousness of
12  the jail sentence that Mr. Deegan has claimed.
13  Mr. Deegan claims that he has an incentive to
14  flee because a serious jail sentence under the
15  guidelines awaits him for the bank fraud
16  charges.  If there is a conviction in this
17  case, there's going to be a serious dispute as
18  to what the amount of the fraud is, both
19  because of the value of the plant -- in other
20  words, the plant is worth -- the infrastructure
21  plant is worth a huge amount of money.  The
22  banks are ultimately going to get paid off,
23  despite the fact that because of cash flow
24  problems and stuff, the business -- the company
25  is no longer operating.  So that is going to

84

1   raise a serious dispute as to how much -- what
2   the figure is going to be for calculations.
3   In addition, there's going to be serious
4   dispute, wholly apart from that, how much of
5   the loss to the bank is attributable to the
6   scheme that they allege, which is ultimately
7   moving checks around.  But even their complaint
8   says that ultimately it was moved back into --
9   into the accounts, back into the bank.
10  Although it was used along the way or borrowed
11  along the way, how much was attributable to the
12  scheme versus how much was attributable to the
13  fact that, because of the government's raids,
14  the company was simply going out of business.
15       So there is every expectation that
16  Rabbi Rubashkin has, at the end of the day,
17  even if there is a conviction, given that the
18  amount -- the length of time is tied in fraud
19  cases to the amount of loss -- there are very
20  substantial arguments he has that that
21  amount is far less than the total 30 or
22  30-some-odd million dollar figure that we are
23  now bandying about.  I think that in our -- in
24  sum, Your Honor, our proposal, we would suggest
25  that you raise the bond to $2 million secured,

85

1   although I've indicated we can even go beyond
2   that.  I would next suggest that you provide
3   either for house arrest or, if that is not
4   satisfactory to Your Honor, house -- house
5   arrest to some family or friend home that is
6   outside of Postville while the final stages of
7   the sale of Agriprocessors goes forward; that
8   you order that the security at the plant be
9   electronically reconfigured to keep him out;
10  that the Court would enter a court order that
11  bars him from having any business-related
12  discussions with any Agriprocessors employees;
13  and that that order be distributed to the
14  employees, and, as we said, we will undertake
15  that; that you take control of these passports.
16  And I think, at that point, you will be
17  confident that he is not a risk of flight.  The
18  government, with those conditions, will not be
19  able to demonstrate by a preponderance that he
20  is a risk of flight, and they will not be able
21  to meet what I think is their burden by clear
22  and convincing evidence to demonstrate that he
23  will be a risk to the safety of the community.
24  And that safety, in this instance, they claim,
25  is that he will tamper with evidence in the

86

1   future.  Thank you, Your Honor.
2        THE COURT:  Usually, it's the Court's
3   practice to review the provisions of the Bail
4   Reform Act, Title 18 Section 3142, and then
5   announce my ruling from the bench and follow
6   that up with a written order as required by the
7   Code; however, this is not the usual case.
8   Today I received a substantial number of
9   exhibits.  Obviously, I haven't had a chance to
10  go through those.  Also, I want to give the
11  case some additional thought.  So I'm going to
12  reserve ruling, and I'll enter a written order
13  hopefully tomorrow.  It is the Court's order
14  that the defendant remain detained pending any
15  further ruling by the Court.
16       I forgot to ask, does the defendant
17  have any case authority you want to cite?
18       MR. BROWN:  Your Honor, I think
19  United States versus Orta, that would be 760
20  F.2d 887, Eighth Circuit 1985, I think, sets
21  forth our interpretation of the Bail Reform Act
22  as it applies to this case.
23       THE COURT:  All right.  I'm going to
24  take the matter under advisement.  Again, I
25  hope to give this my prompt attention, and I

87

1  would anticipate being able to enter a written

2  ruling tomorrow.  Defendant will remain

3  detained pending further order of the Court.

4          MR. BROWN:  Thank you, Your Honor.

5          THE COURT:  That will conclude the

6  hearing.

7          (Proceedings concluded at 3:51 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

88

1              C E R T I F I C A T E

2      I, Patrice A. Murray, a Certified
   Shorthand Reporter of the State of Iowa, do
3  hereby certify that at the time and place
   heretofore indicated, a hearing was held before
4  the Honorable Jon S. Scoles: that I reported in
   shorthand the proceedings of said hearing,
5  reduced the same to print by means of
   computer-assisted transcription under my
6  direction and supervision, and that the
   foregoing transcript is a true record of all
7  proceedings had on the taking of said hearing
   at the above time and place.

8

9      I further certify that I am not related
   to or employed by any of the parties to this
10 action, and further, that I am not a relative
   or employee of any attorney or counsel employed
11 by the parties hereto or financially interested
   in the action.

12

      IN WITNESS WHEREOF, I have set my
13 hand this 2nd day of December, 2008.

14

   _____
15 Patrice A. Murray, CSR, RPR, RMR, FCRR
   United States District Court, NDIA
16 4200 C Street S.W.
   Cedar Rapids, Iowa 52404

17
18
19
20
21
22
23
24
25

Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov
to purchase a complete copy of the transcript.